**Susan HAINES, as Administatrix ad Prosquendum and Executrix of the Estate of Peter F. Rossi, Plaintiff,**

v.

**LIGGETT GROUP, INC., a Delaware Corporation, et al., Defendants.**

**Civ. A. No. 84–678 (HLS).**

United States District Court,
D. New Jersey.

Feb. 6, 1992.

682

Cynthia A. Walters, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, N.J., for plaintiff Susan Haines.

Alan S. Naar, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, N.J., for Liggett Group, Inc.

Alan E. Kraus, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for R.J. Reynolds.

William S. Tucker, Stryker, Tams & Dill, Newark, N.J., for Lorillard, Inc.

Michael J. Vassalotti, Brown & Connery, Westmont, N.J., for Phillip Morris, Inc.

Russell L. Hewit, Dughi & Hewit, Cranford, N.J., for The Tobacco Institute.

OPINION

SAROKIN, District Judge.

*Introduction*

In light of the current controversy surrounding breast implants, one wonders when all industries will recognize their obligation to voluntarily disclose risks from the use of their products. All too often in the choice between the physical health of consumers and the financial well-being of business, concealment is chosen over disclosure, sales over safety, and money over morality. Who are these persons who knowingly and secretly decide to put the buying public at risk solely for the purpose of making profits and who believe that illness and death of consumers is an appropriate cost of their own prosperity!

As the following facts disclose, despite some rising pretenders, the tobacco industry may be the king of concealment and disinformation.

In 1954, the tobacco industry promised to disseminate the results of industry-sponsored, independent scientific research for the purpose of answering the question: "Does cigarette smoking cause illness?" Decades later, one searches in vain for a "Frank Statement to Cigarette Smokers" from the tobacco industry which purports to answer that question.

Plaintiff alleges that defendants have perpetrated a public relations fraud. Plaintiff has presented evidence from which a reasonable jury could conclude that the tobacco industry in general, and defendants in particular, were aware of the risks of smoking; were concerned about the publication of those risks by others and the consequent impact upon cigarette sales; and sought to discredit or neutralize the adverse information by proffering an independent research organization, the Council for Tobacco Research (the "CTR"), which purportedly would examine the risks of smoking and report its finding to the public. The evidence presented by plaintiff supports a finding that the industry research which might indict smoking as a cause of illness was diverted to secret research projects and that the publicized ef-

forts were primarily directed at finding causes other than smoking for the illnesses being attributed to it.

A jury might reasonably conclude that the industry's announcement of proposed independent research into the dangers of smoking and its promise to disclose its findings was nothing but a public relations ploy—a fraud—to deflect the growing evidence against the industry, to encourage smokers to continue and non-smokers to begin, and to reassure the public that adverse information would be disclosed.

While the efforts which the CTR chose to advertise were well publicized, plaintiff learned of a secret division of the CTR, the "special projects" division. Under the auspices of the special projects program, defendants' counsel and other tobacco industry attorneys collaborated in assessing, monitoring, and directing the scope of research projects purportedly designed to identify expert witnesses and to develop evidence supporting defendants' positions in existing and anticipated litigation and Congressional hearings. Defendants insist that their "special projects" efforts are entirely distinct from and unrelated to the CTR's advertised "independent" research and thus, "special projects" documents are protected by the attorney-client privilege. However, plaintiff seeks discovery of the "special projects" documents otherwise subject to the attorney-client privilege on the ground that said documents come within the crime/fraud exception to the privilege.

Plaintiff has presented *prima facie* evidence that defendants' "special projects" program was interrelated and intermingled with the CTR's supposedly "independent" research. The facts presented support plaintiff's overall theory of fraud based on the false claims regarding the independence of CTR-sponsored research and on the likelihood that defendants mounted a public relations campaign designed to discredit the links between smoking and disease which defendants knew existed. Furthermore, there is evidence supporting the

conclusion that research which might tend to prove smoking a cause of such illnesses was diverted into special projects and intentionally shielded by the attorney-client privilege so as to prevent its disclosure.

The court has conducted an *in camera* review of selected special projects documents, and, as presented in the opinion below, the documents speak for themselves in a voice filled with disdain for the consuming public and its health. Despite the industry's promise to engage independent researchers to explore the dangers of cigarette smoking and to publicize their findings, the evidence clearly suggests that the research was not independent; that potentially adverse results were shielded under the caption of "special projects;" that the attorney-client privilege was intentionally employed to guard against such unwanted disclosure; and that the promise of full disclosure was never meant to be honored, and never was. Accordingly, the court concludes that the crime/fraud exception applies and that plaintiff is entitled to discovery of the withheld special projects documents.

*Procedural History*

Before the court is plaintiff's appeal from Magistrate Judge Hedges' May 22, 1991 Letter–Order holding that certain documents requested by plaintiff of defendants are not subject to discovery under the crime/fraud exception to the attorney-client privilege.

Also before the court is Special Master Pisano's Report and Recommendation upholding defendants' assertion of privilege with respect to the same 1500 documents subject to the Magistrate Judge's crime/fraud ruling.[1]

The documents in question pertain to the "Special Projects" program of the Tobacco Institute Research Council ("TIRC"), later called the Council for Tobacco Research ("CTR"). Plaintiff's counsel has previously had discovery of CTR documents in *Cipollone v. Liggett,* Civ. No. 83–2864(HLS). As this court recognized in its Opinion denying the *Cipollone* defendants' motion for a di-

---

**1.** Since the time that the appealed Letter–Order and the Report and Recommendation were filed, Special Master Pisano has been appointed the Magistrate Judge assigned to this court.

rected verdict, 683 F.Supp. 1487, 1490–93 (D.N.J.1988), the CTR-sponsored research projects were generally unrelated to the core health issues implicated by cigarette smoking. However, during the course of that trial, plaintiff's counsel learned that the CTR had a separate "special projects" program about which defendants had not provided full discovery.[2] The "special projects" division of the CTR did sponsor research directly relevant to the hazards of smoking.

Plaintiff's counsel also learned that the "special projects" division was specifically designed to sponsor epidemiological studies which could be of use to cigarette manufacturers in their defense of various current and future suits against them based on the hazards of cigarette smoking. Plaintiff's counsel indicated during the *Cipollone* trial that those withheld documents might be subject to discovery on the basis of the crime/fraud exception to the attorney-client and work-product privileges, but this issue was neither pressed nor resolved during the course of the *Cipollone* trial.

Now in the *Haines* case, plaintiff seeks to discover those "special projects" documents which have to this point been withheld pursuant to the attorney-client and work-product privileges. Plaintiff has already obtained discovery of various "special project" research proposals, correspondence between researchers, and "special project" reports and studies, but as to other documents, plaintiff has only been provided with a "privilege log" prepared by defense counsel. Defendants represent that the withheld documents relate to defendants' counsels' comments on strategic issues in cigarette defense litigation consistent with the express purpose of the "special projects" division of the CTR.[3] Defendants have withheld approximately 1500 documents pursuant to their privilege claims.

The Magistrate referred the question of whether defendants have properly asserted the attorney-client and work-product privileges to Special Master Pisano. However, defendants objected to having the Special Master determine whether the crime/fraud exception to the privileges applied in this case. Accordingly, the crime/fraud question was to be decided by the Magistrate.

The Special Master reviewed the 1500 documents in their entirety, and reported certain conclusions in his Report and Recommendation dated May 29, 1991. The Special Master noted:

> The documents reflect, in the main, discussions concerning the proposed CTR projects, the progress of those projects, the possibility of recommending additional research ideas and the application of research results to the legal theories available in defense of existing and anticipated litigation.

May 29, 1991 R & R at 9. The Special Master recommended upholding defendants' privilege claims with respect to all but six of the 1500 documents. He also "tagged" four files of documents which he considered relevant for purposes of the crime/fraud issue and provided those documents to the Magistrate. Plaintiff agrees that the four files "tagged" by the Special Master are representative of the documents which support plaintiff's crime/fraud argument.

The Magistrate solicited and considered the written submissions of counsel on the crime/fraud issue and proceeded to address the merits of plaintiff's crime/fraud contention without oral argument pursuant to General Rule ·78. The Magistrate Judge's one paragraph resolution of the "merits" of the crime/fraud issue holds, in its entirety:

> I am not satisfied that plaintiff has made a showing under *Zolin* sufficient to overcome the attorney-client privilege.

May 22, 1991 Letter–Order, Def.Exh. A. · The parties dispute whether the Magistrate Judge conducted an *in camera* re-

**2.** 12/6/91 Aff. of Marc Edell, ¶¶ 3–8; Plt. Brief at 5 and note 1.

**3.** Plaintiff contends that she first learned of the litigation purpose of the special projects from Special Master Pisano's Report and Recommen-dation. 12/6/91 Aff. of Marc Edell, ¶ 8. Defendants specifically contend that the special projects division was entirely litigation oriented. *See e.g.,* Def. Brief at 2; 12/10/91 Letter from William Alinder, Esq. to the Court.

view of the relevant documents tagged by the Special Master. Plaintiff contends that the Magistrate did not conduct an *in camera* review (Plt. Brief at 39–42), while defendants argue that he did. Def. Brief at 5, 7–8, 10 n. 2. In his May 22, 1991 Order, the Magistrate Judge did state:

> I have also reviewed documents presented by Mr. Pisano. These documents are identified in Mr. Pisano's affidavit, the original of which was filed under seal on April 15, 1991.

Regardless of whether the Magistrate Judge did in fact conduct an *in camera* review of the documents (and based on the above quote, it appears that the Magistrate Judge did review the documents), plaintiff appeals the effective outcome of the Magistrate Judge's Order rejecting application of the crime/fraud exception to certain or all of the 1500 documents.

As for the Special Master's Report and Recommendation, the parties dispute whether plaintiff made a timely objection to the Special Master's Report and Recommendation, filed May 29, 1991, and whether such written objections were necessary in order to preserve plaintiff's right to object to the Report and Recommendation at a subsequent hearing. Plaintiff contends that no written objections were required pursuant to this court's January 29, 1991 Order referring certain discovery issues to the Special Master since, as plaintiff reads the January Order, objections could be voiced at a hearing. In addition, plaintiff argues that she has preserved her objections to the Special Master's Report and Recommendation—her objection being that the crime/fraud exception should apply—because the identical questions are at issue in her previously filed appeal from the Magistrate Judge's order. Plaintiff had proposed that the hearing on the Report and Recommendation occur in conjunction with the July 9, 1991 oral argument on plaintiff's appeal from the Magistrate. Defendants objected to such a disposition, since they argue that plaintiff is precluded from objecting to the Special Master's Report.

The court heard oral argument on July 9, 1991 only in regard to plaintiff's appeal from the Magistrate Judge's order and not with regard to the Special Master's Report and Recommendation.

*Factual Background*

The factual background relevant to this motion consists of plaintiff's theory of the alleged fraud by defendants and the evidence which plaintiff has marshalled in support of that theory.

A. Plaintiff's Fraud Theory

■ Plaintiff's theory of the fraud in this case is that defendants knew of the hazards of cigarette smoking; concealed information which demonstrated the dangers of smoking; and affirmatively misled the public with regard to the risks of smoking. It is this last factor—defendants' affirmative misrepresentations to the public—which constitutes the alleged fraud.

In addition to defendants' direct representations to the public regarding the risks of smoking, a crucial element of plaintiff's case is defendants "sub-fraud": the alleged abuse of the CTR as a primary vehicle for misleading the public. Defendants slavishly advertised the CTR as an entirely independent and objective scientific research body which would investigate the supposed hazards of cigarette smoking and report the results of those cigarette studies to the public. Plaintiff has provided just a few of the many advertisements by defendants as exhibits in this appeal.

For example, defendants promised full public disclosure of relevant research in The Tobacco Institute advertisement captioned "A Statement About Tobacco and Health":

> We recognize that we have a special responsibility to the public—to help scientists determine the facts about tobacco and health, and about certain diseases that have been associated with tobacco use.
>
> We accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee, which provides research grants to independent scientists. We pledge continued support of this pro-

gram of research until the facts are known.

· · · · ·

*We shall continue all possible efforts to bring the facts to light.* In that spirit we are cooperating with the Public Health Service in its plan to have a special study group review all presently available research....

Plt. Exhibit I, p. 1 (emphasis added). Indeed, the express purpose of the TIRC, as stated in its by-laws, is to "make [information] available to the public." Plt. 1/18/91 Brief to Special Master, Exh. B. Defendants repeatedly emphasized their commitment to full, public disclosure of CTR sponsored research: "We are cooperating in efforts to learn and to make known *all* the facts." Plt.Exh. I, p. 2 (emphasis in original). As late as 1970, the tobacco industry repeated its representation that it promoted the disclosure of relevant facts: "The Tobacco Institute believes that the American public is entitled to complete, authenticated information about cigarette smoking and health." Plt.Exh. I, p. 4.

At the same time, defendants widely touted the "independent" and "objective" nature of the CTR, disclaiming any affiliation with or influence of the tobacco industry. These representations extended to claims of independent decision-making regarding the funding of research proposals.

> Since 1954, tobacco growers, auction warehousemen and manufacturers have been supporting the Tobacco Industry Research Committee's program of independent research into all aspects of tobacco use and health. Research policy and program is determined by a Scientific Advisory Board.... These men develop the research policy, determine areas of research interests and award grants-in-aid for research.

Plt.Exh. I, p. 2. In 1970, the Tobacco Institute promoted the independence of the CTR in its editorial-styled advertisement, "The question about smoking and health is still a question":

> [A] major portion of this scientific inquiry has been financed by the people who know the most about cigarettes and have a great desire to learn the truth ... the tobacco industry.
> And the industry has committed itself to this task in the most objective and scientific way possible.
> ....
> Completely autonomous, CTR's research is directed by a board of ten scientists and physicians.... This board has full authority and responsibility for policy, development and direction of the research effort.

Plt.Exh. I, p. 3. As late as 1984, the same year in which this suit was filed, defendant R.J. Reynolds advertised in the New York Times: "Studies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary. These scientific findings come from research completely independent of the tobacco industry." Plt.Exh. I, p. 5.

Plaintiff contends that in fact, the publicized efforts of the tobacco industry to research the issues and to report the results to the public were a public relations hoax—that no meaningful research was conducted and that it was never the industry's intention to discover or publish the truth about the risks of smoking. In contrast to defendants' promotion of the CTR's "independence" and "objectivity," plaintiff alleges that defendants guided the CTR to sponsor research tending to prove that other causes existed for the illnesses being attributed to smoking, in an effort to perpetuate doubts about links between smoking and disease rather than to uncover the truth. If true, such manipulation of the CTR would be directly contrary to defendants' advertised representations regarding the industry-sponsored CTR. This "sub-fraud" with respect to the CTR is a major component of plaintiff's larger fraud theory, i.e., that defendants affirmatively mislead its consumers as to the known hazards of smoking. The court specifically concludes that plaintiff presents a viable theory of fraud, of which the role of the CTR is an integral part.[4]

---

4. Defendants' potential interest in the alleged fraud is obvious. As Rose Cipollone testified in

## B. Evidence Supporting Plaintiff's Fraud Theory

It now appears that there were a series of research grants designated as "special projects" which were developed in a manner so as to receive the protection of the attorney-client privilege. The "special projects" division was under the auspices of the CTR, although defendants insist that the "special projects" division was managed entirely separately from the CTR. Def. Brief at 1. The claimed purpose of the "special projects" division was to sponsor research relevant to the links between smoking and disease in order to develop a field of expert witnesses for defensive litigation in tort suits. Consistent with this purpose, defendants' counsel were substantially involved in strategic and specific decision-making within the "special projects" division.

Although defendants represented to the public that research conducted under the auspices of the CTR would be made public, the "special projects" research was not publicized, nor was the existence of the "special projects" division disclosed. In addition to this nominal association between the CTR and tobacco industry, the channelling of selective research proposals into either the CTR or the "special projects" division and the shared research between the two belies defendants' public representations and ongoing defense that the CTR was an independent, objective body. Indeed, plaintiff's counsel first learned about the existence of the special projects division from the following testimony of Dr. Sheldon Sommers, M.D., Scientific Research Director of the CTR from 1969 to 1972, during cross-examination at the *Cipollone* trial:

Q: What are CTR special projects?

A: From time to time a proposal will reach the council, which is of a type that doesn't fit into the Scientific Advisory Board's research program. These are just examples of the kind of research that would perhaps be a special project.

12/6/91 Aff. of Marc Edell, ¶ 5; T 8784–8785, Exh. F of Plt. Supplemental Submission.

In addition, plaintiff has presented concrete evidence of commingling and cooperation between the CTR and the special projects division. For instance, plaintiff has discovered a 1966 letter reassigning a CTR research project to the special projects division. Plt. Reply Brief Exh. C. Plaintiff has also discovered that scientists working in conjunction with defendants' litigation efforts were simultaneously touted as independent CTR-sponsored scientists. Plt. Reply Brief at 8–17 and Exhs. D–E (proving that Drs. Seltzer, Wolf, and Friberg were sponsored by both the CTR and the special projects division). Special Master Pisano has also suggested that there was substantial commingling between the "special projects" division and the regularly sponsored CTR projects:

As a demonstration of the fact that the CTR had obtained a dual purpose, Dr. F.G. Colby characterized himself as "a person wearing two hats. Number one, [he] was in charge of R & D information; number two, [he] was responsive to the legal department." (Deposition of Colby, p. 279, plaintiff Exhibit N.) Dr. Colby's lawyer directed him "not to answer [questions at his deposition] when he served as an armchair advisor to lawyers re pending litigation or threat of litigation, when he communicated to the company, to the R & D department." (Deposition of Colby, *Id.*)

May 28, 1991 R & R at 3. The Colby testimony supports plaintiff's contentions that the CTR's scientific efforts were commingled with defendants' legal concerns.

The possibility that research was selectively channelled and disclosed based on a determination of usefulness to tobacco in-

---

deposition before she died, the tobacco industry advertisements which held out the CTR as an independent scientific body that had yet to link cigarette smoke to cancer afforded addicted smokers like Rose Cipollone a convenient excuse to continue smoking, despite contrary reports linking smoking to cancer. *See Cipollone,* 683 F.Supp. at 1489–91 ("This [advertising] campaign served to create doubt in the minds of the consumer as to smoking and its dangers, and played on the weaknesses of those who were either addicted and/or dependent").

dustry defensive litigation undercuts defendants' specific representations that decisions on project funding were made by completely independent scientific advisors without associations to the tobacco industry, as well as defendants' promise to disclose all relevant information to the public. Furthermore, the possibility that epidemiological studies relevant to the links between smoking and disease were directed into the "special projects" division again supports plaintiff's contention that the CTR research made available to the public was not relevant to the issues which the CTR had promised to investigate.

According to defendants' claims before this court, the withheld documents concern defense counsels' input regarding which projects should be continued or discontinued based on their helpfulness to defendants' defense strategy. *See* Plt. Reply Brief Ex. C (letter memorializing reassignment of research project from CTR to special projects in order to continue funding). Since projects were routed between CTR and the "special projects" division, such involvement of defendants' litigation strategists in those specific funding assignments could amount to tobacco industry manipulation of the CTR. Thus, a key portion of plaintiff's fraud theory is supported by the very existence and explicit purpose of the CTR "special projects" division. On this basis, plaintiff argues that she has established "prima facie" evidence of fraud sufficient to invoke the crime/fraud exception to the attorney-client and work-product privileges. If given discovery of the withheld documents, plaintiff expects to uncover documentation that decision-making regarding "special projects" and CTR projects further commingled defendants' legal and public relations interests with supposedly "objective" science.

*Discussion*

For the reasons explained below, the court finds that there is sufficient *prima facie* evidence of fraud in connection with the public assurances made by defendants

to declare that the crime/fraud exception shall apply in this matter. The court further concludes that any holding to the contrary by the Magistrate Judge was clearly erroneous. In addition to the evidence and factual inferences already put forward by plaintiff, which is certainly sufficient to warrant *in camera* inspection of selected documents, this court's own *in camera* review of the documents supports plaintiff's contentions of the explicit and pervasive nature of the alleged fraud by defendants and defendants' abuse of the attorney-client privilege as a means of effectuating that fraud.

■ This court can only reverse the Magistrate's ruling on this non-dispositive discovery matter if the ruling is either clearly erroneous or contrary to law. Fed. R.Civ.P. 72(a). Plaintiff contends that the ruling below was both. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Under the clearly erroneous standard, mere disagreement between two permissible views of the evidence does not authorize the reviewing court to reverse the lower court. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

In this appeal, there are two questions: (1) whether this court can and should conduct an *in camera* inspection of the disputed documents; and (2) whether the Magistrate Judge's order upholding defendants' claims of privilege was clearly erroneous.

**A. In Camera Review by the Magistrate and this Court is Warranted**

■ The crime/fraud exception to the attorney-client and work-product privileges was most recently discussed in *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).[5] In that case, the Court specifically addressed the narrow

---

5. The court notes that both the attorney-client privilege and the work-product privilege are subject to the same crime/fraud exception. *In*

*re Grand Jury Proceedings (FMC)*, 604 F.2d 798, 802–03 (3d Cir.1979).

question of "whether the applicability of the crime-fraud exception must be established by 'independent evidence' (*i.e.*, without reference to the content of the contested communications themselves), or, alternatively, whether the applicability of that exception can be resolved by an *in camera* inspection of the allegedly privileged material." *Id.* at 556, 109 S.Ct. at 2623. *Zolin* held that *in camera* inspection *could* be used when the party challenging the privilege 1) requests *in camera* inspection, and 2) "present[s] evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability." 491 U.S. at 574–75, 109 S.Ct. at 2632.

> Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relevant importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

491 U.S. at 572, 109 S.Ct. at 2631. Understandably, the decision to engage in *in camera* review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal. *Id.* ("[t]he threshold we set, in other words, need not be a stringent one"); *see also In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1214 (3d Cir.1989).

Although the Magistrate's reference to *Zolin* fairly raises questions as to whether the Magistrate concluded that plaintiff had made a showing insufficient to justify *in camera* review, the court relies on the Magistrate's specific statement that he reviewed the documents forwarded by the Special Master. Based on the strong evidence adduced by plaintiff (which is reviewed *supra*), this court concurs with the Magistrate's implicit determination that

plaintiff has made a sufficient showing of intermingling between the CTR and the "special projects" division to justify *in camera* inspection of the documents. Plaintiff's evidence and the fair inference arising from the purpose and role of the "special projects" division undercuts defendants' public representations concerning the CTR's independence and leads this court to conclude, as did the Magistrate Judge, that *in camera* inspection of the disputed documents is likely to yield evidence of the exception's applicability.

Moreover, defendants insist that the Magistrate did review the documents *in camera* (Def. Brief at 10 n. 2), and defendants do not appeal from the Magistrate Judge's order, which necessarily encompasses the implicit conclusion that *in camera* review is warranted. In addition to the court's own conclusion that *in camera* review is justified, *in camera* review by this court would seem to be required if the court is to properly rule whether the Magistrate's order, which was based on his own *in camera* inspection, was clearly erroneous. Accordingly, this court did review selected documents *in camera*. The remaining question is whether the Magistrate's conclusion that the crime/fraud exception should not be applied in this case was clearly erroneous or contrary to law.

**B. The Legal Standard for Application of the Crime/Fraud Exception**

■ The Supreme Court specifically clarified that *Zolin* only addressed the *type* of evidence which could be used to prove the applicability of the crime/fraud exception and not the *quantum* of evidence necessary to invoke the exception. 491 U.S. at 563–64, 109 S.Ct. at 2626–27. Nevertheless, the Court did note by way of background:

> The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—"ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to

*future wrongdoing.*" 8 Wigmore, § 2298, p. 563 (emphasis in original); see also *Clark v. United States,* 289 U.S. 1, 15 [53 S.Ct. 465, 469, 77 L.Ed. 993] (1933). It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the "seal of secrecy," *ibid.,* between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime. *O'Rourke v. Darbishire,* [1920] A.C. 581, 604 (P.C.).

*Id.* at 562–63, 109 S.Ct. at 2625–26. The case law is clear as to when the crime/fraud exception applies:

In deciding whether the crime-fraud exception applies to a communication between a lawyer and his client, courts apply a two part test. First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*In re Grand Jury Investigation,* 842 F.2d 1223, 1226 (11th Cir.1987) (citations omitted); *see also In re Grand Jury Empanelled May 7, 1987,* Misc. No. 87–165, 1989 WL 72260, *7, 1989 U.S.Dist.LEXIS 7416, *23–24 (D.N.J. June 28, 1989).

However, Supreme Court case law provides little explication of the quantum of proof necessary to defeat the privilege, other than *Clark v. United States'* seminal, ambiguous statement: "To drive the privilege away, there must be 'something to give colour to the charge;' there must be '*prima facie* evidence that it has some foundation in fact.'" *Clark,* 289 U.S. at 15, 53 S.Ct. at 469.[6] Nevertheless, it is firmly established that "[i]n determining whether the exception is applicable, the

client's intention controls and the privilege may be denied even if the lawyer is altogether innocent." *In re Grand Jury Proceedings (FMC),* 604 F.2d 798, 802 (3d Cir. 1979) (citing *United States v. Calvert,* 523 F.2d 895, 909 (8th Cir.1975)).

Aside from *Zolin* and *Clark,* the court must look to the various Courts of Appeals for further explication of the quantum of proof necessary to apply the crime/fraud exception. Although the Third Circuit has yet to address the quantum of proof issue directly, the court has used strong language suggestive of its support of and belief in the crime/fraud exception.

[B]ecause the privilege obstructs the search for truth and because its benefits are, at best, 'indirect and speculative,' it must be strictly confined within the narrowest possible limits consistent with the logic of its principle.

604 F.2d at 802–03 (citations omitted). In cases such as *In re Grand Jury Proceedings (FMC)* and *In re Impounded Case (Law Firm),* 879 F.2d 1211, 1214 (3d Cir. 1989), the Third Circuit has referred to and incorporated the requirement that the party seeking discovery make a *"prima facie"* showing of crime or fraud, but the Circuit has not expanded on what a *"prima facie"* showing actually means. The Third Circuit has cited an Eighth Circuit crime/fraud case with approval, but the Eighth Circuit has also failed to provide any more guidance other than requiring *"prima facie"* evidence, without further elaboration. *See In re Grand Jury Proceedings (FMC),* 604 F.2d at 802, *citing In re Murphy,* 560 F.2d 326, 337 (8th Cir.1977).

Other Courts of Appeals have attempted to elaborate on the meaning of *prima facie* evidence in the crime/fraud context. For instance, the Court of Appeals for the District of Columbia has described *prima facie* evidence as evidence which, if believed, would establish fraud. *In re Sealed Case (I),* 754 F.2d 395, 399 (D.C.Cir.1985). The Fifth Circuit adopted the definition of *prima facie* evidence contained in Black's Law Dictionary: "[evidence] such as will prevail

---

6. *See Zolin,* 491 U.S. at 563 n. 7, 109 S.Ct. at 2626 n. 7 (acknowledging the confusion and ambiguity generated by *Clark's* use of the term "prima facie" showing).

until contradicted and overcome by other evidence...." *In re International Systems and Controls Corp.*, 693 F.2d 1235, 1242 n. 11 (5th Cir.1982). In *In re Antitrust Grand Jury*, 805 F.2d 155, 166 (6th Cir.1986), the Sixth Circuit disagreed with the Fifth Circuit and followed the Second Circuit's standard, which is that *prima facie* evidence of crime/fraud must prove "probable cause that the legal department was used ... for purposes other than seeking and receiving legal advice." *In re John Doe Corp.*, 675 F.2d 482, 491–92 (2d Cir.1982). However, the Second Circuit has since clarified its use of the term "probable cause" and noted that there is no difference between "probable cause" and the *"prima facie* showing" required by other circuit courts: "Both require that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984); *see also id.* ("the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent").

None of these proposed explanations are binding on this court. However, all of these proposed standards amount to the same basic proposition—has the party seeking discovery presented evidence which, if believed by the fact-finder, supports plaintiff's theory of fraud? (Plaintiff need not prove the fraud itself at this point, since the evidence in support of the theory, as well as defendants' rebuttal, have yet to be evaluated by the ultimate fact-finder.) The court is comfortable applying the general, *prima facie* standard as explained by the

various courts of appeal, since the court concludes that the evidence overwhelmingly favors applying the crime/fraud exception in this case, so much so that the court must find the Magistrate Judge's conclusion to the contrary clearly erroneous.

### C. The Magistrate's Order Was Not Contrary to Law

■ Plaintiff suggests that Magistrate Hedges' ruling was "contrary to law" because of the Magistrate's single citation to *Zolin.*[7] Because *Zolin* specifically concerned whether courts could consider the disputed documents *in camera* (as opposed to how much evidence is required to apply the crime/fraud exception), plaintiff argues that the Magistrate's citation was not on point and that therefore, the Magistrate must have applied an incorrect legal standard in his review of the evidence. However, *Zolin* is the only major recent case to discuss the general parameters and purpose of the crime/fraud exception, and it is clear to the court that the Magistrate referred to *Zolin* generally. The court concludes that the Magistrate's ruling was not contrary to law on the basis of the citation to *Zolin.*[8] Therefore, the only genuine dispute on this appeal is a factual one: Has plaintiff made a sufficient evidentiary showing which justifies application of the crime/fraud exception to the disputed CTR "special projects" documents, and was the Magistrate's conclusion that plaintiff had not made such a showing "clearly erroneous"?

### D. The Magistrate's Order Was Clearly Erroneous

■ As described at length *supra*, plaintiff's theory for the application of the crime/fraud exception is grounded on the

---

7. Defendants correctly contend that plaintiff cannot invoke the brevity of the Magistrate's Letter–Order as suggestive of the Magistrate's failure to consider all the evidence or of the possibility that his ruling was clearly erroneous, since the Letter–Order did state that the Magistrate had "reviewed and considered" all of the parties' submissions.

8. Apparently, defendants argued to the Magistrate that plaintiff was precluded from the disputed discovery by virtue of the preemption

decision. However, defendants have not renewed that argument on this appeal, apparently in concession to plaintiff's argument that the preemption decision does not affect or bar her third party suppression and alternate design claims. *See* Plt. Brief at 7–8. In addition, plaintiff notes—and defendants do not dispute—that as in *Cipollone*, the preemption decision does not preclude discovery of certain documents which might be admissible as admissions on the causation question. *See id.* at 11.

undisputed fact that the cigarette industry advertised the CTR as an "independent" research body in order to gain the public's confidence that CTR-sponsored research was not manipulated, while at the same time, defendants coordinated research between the CTR and the "special projects" program. Plaintiff contends that the existence and purpose of CTR's "special projects" is *prima facie* evidence that the tobacco industry used the CTR and the "special projects" program in order to perfect the industry's fraud on the public. Plaintiff argues that

> defendants' continued pre and post–1965 public relations reference to industry sponsored research as "independent," "totally independent," "objective," performed with "absolute objectivity" and as "completely independent of the tobacco industry" runs directly contrary to this idea that this *same* research was sponsored and promoted for the primary and/or singular purpose of defense of litigation. If that is the truth, then the "use" of *selected* information generated for "litigation" purposes in a public relations capacity as a means of undermining public awareness of the health hazards of smoking in and of itself establishes fraudulent intent.

Plt. Brief at 30–31 (emphasis in original).

█ In support of this theory, plaintiff relies upon the evidence adduced at the *Cipollone* trial (which this court assessed in its Opinion denying the *Cipollone* defen-

dants' motion for a directed verdict) and upon various CTR documents which plaintiff has already received in discovery. Specifically, plaintiff contends that there is ample and overwhelmingly persuasive evidence that: (1) the cigarette manufacturers recognized and knew of the serious health risks arising from cigarette smoking;[9] (2) despite the tobacco industry's knowledge to the contrary, defendants mounted a major public relations effort to create doubt in the public's mind as to the hazards of cigarette smoking;[10] and (3) the CTR "special projects" program sponsored research supportive of the manufacturers' litigation strategies which was used in conjunction with the manufacturers' public relations campaign, thereby tainting the advertised independence and objectivity of the CTR. Thus, in addition to the fraudulent presentation of the CTR (the "sub-fraud"), plaintiff further argues that the cigarette manufacturers' use of the CTR "special projects" program for purposes of their litigation strategies was intimately interconnected with the manufacturers' public relations campaign to perpetuate the alleged public fraud that cigarette smoking was not harmful.

The first two propositions—that cigarette manufacturers knew of the dangers of smoking but sought to create public doubt as to that fact—were previously at issue in the *Cipollone* trial. However, plaintiff's current application to apply the crime/fraud exception turns on the third

---

**9.** Some of defendants' own documents which plaintiff marshals in support of this point and which the court considers persuasive evidence are: a 1961 memo from Arthur D. Little acknowledging cancer causing elements in cigarette tobacco (Plt.Exh. G(1)); a 1956 Phillip Morris internal memorandum acknowledging potential cancer hazard (Plt.Exh. G(2)); Dr. Wakeham's 1961 report conceding that smoking may be a cause of cancer and disease, and listing particular compounds in cigarette smoke identified as carcinogens (Plt.Exh. G(3)); and a 1946 Lorillard letter acknowledging the possibility of the presumption that tobacco use contributes to cancer (Plt.Exh. G(4)).

Contrary to defendants' suggestion, documents which pre-date the 1964 establishment of the "special projects" division are relevant to plaintiff's crime/fraud allegations involving "special projects." Plaintiff must establish de-

fendants' general manipulation of the CTR in order to lay the foundation for her theory of fraud with respect to the "special projects" division.

**10.** *See* evidence cited at Plt. Brief, 16–18, 19–25 and Plt.Exhs. G(7)–(14) regarding public statements by the CTR and by defendants' public relations firm, Hill & Knowlton, denying link between smoking and cancer, *e.g.*, Plt.Exh. G(9) (stating that nothing identified in tobacco smoke causes cancer); *see also* Plt. Brief at 25–27 and Plt.Exh. G(16), describing internal documents suggesting CTR's lack of independence and purpose as part of public relations campaign to cast doubt on links between smoking and disease, *e.g.*, Plt.Exh. G(10) (CTR efforts to advertise no proven links between smoking and cancer functions as "insurance" for tobacco industry).

factual proposition—i.e., that the "special projects" program was and is an integral part of the CTR public relations fraud, which is in turn a part of defendants' larger fraud to deceive consumers about the link between smoking and disease.[11]

With respect to the first two factors— whether defendants knew of the hazards of smoking and used the CTR for fraud— defendants argue that plaintiff cannot rely on this court's *Cipollone* directed verdict Opinion because in that context, the court did not review the evidence under the stricter standard necessary for purposes of proving the applicability of the crime/fraud exception.

■ Defendants are correct. This court's directed verdict Opinion in *Cipollone* does not as a matter of law mandate the conclusion that the same facts support application of the crime/fraud exception. However, as a matter of fact, the court finds for purposes of this appeal that plaintiff has presented strong evidence that defendants knew of the health risks implicated by cigarettes, yet funded the CTR for the express purpose of planting doubt in the public's mind as to those health risks. The court bases this conclusion on this court's own familiarity with the evidence adduced at the *Cipollone* trial discussed in the directed verdict Opinion, *see* 683 F.Supp. at 1490–93,[12] as well as all of the evidence presented by plaintiff on this appeal. However, on this appeal, the key issue before this court involves new claims and evidence unaddressed in *Cipollone:* whether plaintiff has made a *prima facie* showing linking the "special projects" program to the alleged public relations fraud on the public. Defendants contend:

> It is not enough for plaintiff merely to allege that CTR was used for fraudulent purposes, and then conclude without more that "hence *all* attorney involve-

ment in CTR was in furtherance of that fraud and not subject to the privilege." Plt.Mem. at 35 (Emphasis in original). Plaintiff must provide evidence that *these* communications—concerning, not the SAB grant program but these separate and distinct litigation-oriented CTR Special Projects funded through the CTR accounting department—were in furtherance of the alleged crime or fraud.

> Plaintiff adduced no evidence at all to show that *these* communications concerning CTR Special Projects were in furtherance of any improper activity.

Def. Brief at 11–12.

In the court's opinion, the factual inference arising from the segregation of the "special projects" program and its avowed purpose of generating research for use in defendants' litigation is highly suggestive of the public fraud which plaintiff alleges. The fact that selective research was "siphoned off" into "special projects" protected against disclosure due the claims of privilege, strongly implies that the CTR "special projects" division was an integral part of the CTR's general practice of sponsoring and reporting selective research. Moreover, sharing the special projects, litigation oriented research with the CTR directly counters defendants' representations that CTR published research was independently selected and monitored. According to defendants themselves, the attorney involvement in the special projects program included proposing and monitoring research consistent with defendants' litigation interests. Such commingling of special projects with CTR research directly implicates the special projects program in the alleged ongoing public fraud for which this court has found *prima facie* evidence.

But in addition to the evidence and factual inferences already proffered by plaintiff,

---

**11.** Indeed, the jury in *Cipollone* might well have found otherwise on plaintiff's fraud and conspiracy claims had it known of these added facts regarding the use of the CTR.

**12.** The court properly relies on the evidence adduced during the course of the *Cipollone* trial. The court did not conduct a separate crime/fraud hearing in the *Cipollone* case because such

a hearing would have required substantially the same proofs as were adduced at the trial itself. Trans. at 7, Plt.Exh. D. The court has since heard the evidence presented in *Cipollone,* such that this court is in the unique position of being able to evaluate the full scope of evidence supporting plaintiff's crime/fraud contention in the instant case.

the most persuasive evidence prompting this court to apply the crime/fraud exception and to reverse the Magistrate's order as clearly erroneous comes from the disputed documents themselves. This court's own *in camera* inspection of selected documents has revealed the most explicit admissions that defendants used the special projects program to further the alleged ongoing fraud and deception surrounding the advertised function and operation of the CTR. Even more disturbing, the documents indicate that defendants specifically abused the attorney-client privilege in their efforts to effectuate their allegedly fraudulent scheme. The court recounts some of the most damaging evidence below, recognizing the sensitive task of fulfilling the court's duty to support and justify its holding while temporarily preserving the confidentiality of otherwise privileged documents.

### 1. Document #RC–6033263 et seq.

The October 6, 1966 minutes of a September 30, 1966 meeting, transmitted via an October 11, 1966 letter from Shook, Hardy & Bacon, states:

> Progress reports on special projects by Ad Hoc committee. The special projects identified at SP–103 and SP–104 assign the CTR and the TI the responsibility of investigating: 1) "specific refutation of misleading statements regarding cigarette smoking commonly appearing in anti-smoking propaganda;" and 2) "collection of 'predictions which have not come true.'"

This statement supports plaintiff's hypothesis that "special projects" and the CTR in general, as well as the Tobacco Institute, coordinated and commingled their efforts in defendants' public relations campaign to create doubt about links between smoking and disease. This is exactly the type of evidence which defense counsel concedes could link "special projects" activities to plaintiff's fraud claim, giving rise to the crime/fraud exception. The above quote supports plaintiff's theory that the CTR was not an independent research body but rather was (and is) defendants' agent, whose research is guided by defendants' in

coordination with defendants' litigation and public relations efforts.

### 2. Documents #RC–6033468 et seq. and #1005122 et seq.

Plaintiff's claim of CTR manipulation through the siphoning of relevant projects is further supported by the notes of the September 10, 1981 Committee of General Counsel, transmitted via a September 18, 1981 letter from Webster & Sheffield, which states:

> Stevens: "I need to know what the historical reasons were for the difference between the criteria for lawyers' special projects and CTR special projects." ...
>
> Jacob: "When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR special project. If he did not like it, then it became a lawyers' special project."
>
> Stevens: "He took offense re scientific embarrassment to us, but not to CTR."
>
> Jacob: "With Spielberger, we were afraid of discovery for FTC and Aviado, we wanted to protect it under the lawyers. We did not want it out in the open."

In this court's opinion, no evidence could be more damning. These minutes explicitly acknowledge that the supposedly "independent" scientific director of CTR channelled research into "special projects" for defendants' litigation efforts. But even more disturbing is defendants' announced practice of using the "special projects" division in order to shield damaging research results from the public *and* the FTC. A document captioned "Notes from the September 10, 1981 Meeting of Company Counsel and Ad Hoc Committee Members" is even more explicit. Page one of the "Notes" states as follows:

> E.J.: Difference between CTR and Special Four (lawyers' projects). Director of CTR reviews special projects—if project was problem for CTR, use Special Four. Also, if there are work-product claims, need the lawyers' protection, *e.g.*, CTR's past director, Bill Gardiner, didn't think much of Rowe's work; Special Four fi-

nanced him and he is now published, *e.g.* motivational research that was done during the FTC investigation was done through Special Four because of possibility that CTR would be subpoenaed. *e.g.* Joe Janus' current study of cohort effect (those born in 1890–1910) is a full CTR project—Special Four gave interim support.

It is admissions such as this which compels this court to find the Magistrate's Order below clearly erroneous. Such clear and intentional abuse of the attorney-client and work-product privileges cannot be tolerated and certainly cannot withstand plaintiff's crime/fraud contentions in this case.

### 3. Document # 01347203 et seq.

Moreover, the documents as to which defendants claim privilege reveal defendants' influence over the CTR, supporting plaintiff's claims of fraudulent advertisement of the CTR as an independent and objective body. The withheld documents include papers such as the November 6, 1978 Memorandum from Donald Hoel regarding the Industry Research Committee meeting of October 26, 1978, in Lexington, Kentucky, which states:

> After some further discussion, Janet and Arnie Henson expressed American Tobacco Company's view that CTR must be maintained but needed new people. It must be more politically oriented. They felt that CTR must look at what is happening and what others are doing to see what questions can be raised, etc. The approach must be steady, slow and conservative. They must find skeptical scientists.... The staff at CTR also needed to be more tobacco oriented with a skeptical view.

This document pertains not only to the special projects division but also to defendants' intentional manipulation of the CTR as a whole.

### 4. Document # 1003718428 et seq.

The court is further convinced that the crime/fraud exception applies in this case given certain documents which could be construed as "admissions" by defendants of the fraudulent use of the CTR. A No-

vember 17, 1978 Memorandum from R.B. Seligman to the CTR file regarding a November 15, 1978 meeting in New York contains the following account:

> As a means of introduction, Bill Shinn described the history, particularly in relation to the CTR. CTR began as an organization called Tobacco Industry Research Council (TIRC). *It was set up as an industry "shield"* in 1954. That was the year statistical accusations relating smoking to diseases were leveled at the industry; litigation began; and the Wynder/Graham reports were issued. *CTR has helped our legal counsel by giving advice and technical information, which was needed at court trials. CTR has provided spokesmen for the industry at Congressional hearings. The monies spent on CTR provides a base for introduction of witnesses.*
>
> Bill Shinn feels that "special projects" are the best way that monies are spent. *On these projects, CTR has acted as a "front";* however, there are times when CTR has been reluctant to serve in that capacity....
>
> Getting away from the historical story, Bill Shinn mentioned that the "public relations" value of CTR must be considered and continued.... A very interesting point, made by Bill Shinn, is the opposition's, "the case is closed with regard to smoking and disease." ... *It is extremely important that the industry continue to spend their dollars on research to show that we don't agree that the case against smoking is closed.... There is a "CTR basket" which must be maintained for "PR" purposes.* ... It is interesting that this proposal by Shinn is somewhat in line with the thinking we had planned to present to the Committee later on in the day. (Emphasis added).

Aside from the obvious and intentional manipulation by defendants of the CTR as a public relations tool rather than an independent, scientific research body, defendants' own "admissions" that the CTR is an industry "shield" and a "front" for "special projects" challenges defendants' current

representations that the two were indeed separate.

Given plaintiff's theories of fraud, which, if believed by a jury based on the evidence presented, would give rise to liability, after an *in camera* review of these selected documents, the court is convinced that the only possible conclusion is that the crime/fraud exception applies to these documents. The court finds that there is *prima facie* evidence that defendants were engaged in an ongoing fraud, and that defendants obtained attorney assistance in furtherance of that fraud through the use of the special projects division. Accordingly, the court finds that the Magistrate Judge's conclusion to the contrary was clearly erroneous.

*Conclusion*

The scope of Special Master Pisano's Report and Recommendation extends to whether defendants properly asserted their claims of privilege, *excluding* the possibility that the Magistrate Judge might conclude that the crime/fraud exception applies to those documents. Thus, any possible objections by plaintiff based on plaintiff's claims of crime/fraud are irrelevant with respect to the Report and Recommendation. Neither party has presented any other objections to the Report and Recommendation, which advised that only 6 of the 1500 documents were *not* subject to privilege claims. Accordingly, the court adopts Special Master Pisano's Report and Recommendation as the order of this court; the six identified documents shall be turned over to plaintiff.

As explained *supra,* the court finds the Magistrate Judge's Order rejecting application of the crime/fraud exception to the remaining documents clearly erroneous. That Order is reversed. This court specifically finds that the 5 withheld documents quoted in this opinion are not privileged in their entirety, and that at least those quoted portions of those documents shall be turned over to plaintiff. Having concluded that plaintiff's theory of fraud is supported by *prima facie,* compelling evidence, the court has sufficient reason to turn over all of the remaining "special projects" documents to plaintiff. However, neither the

Special Master, the Magistrate Judge, or this court has reviewed those documents in order to determine whether the scope of such an order would be too broad and would require defendants to turn over documents which are truly unrelated to plaintiff's claims and which only concern defendants' litigation strategies, etc. Therefore, this court has decided to name a new Special Master, whose task shall be to review the remaining documents in order to determine whether each document is subject to the crime/fraud exception. This Special Master shall be named at a later date.

The court shall issue the appropriate orders.