975 F.2d 81
 61 USLW 2148, 36 Fed. R. Evid. Serv. 782
 Susan HAINES, as Administratrix ad Prosequendum and
Executrix of the Estate of Peter F. Rossi
v.
LIGGETT GROUP INC., a Delaware Corporation; Loew's Theatres
Incorporated, a New York Corporation; R.J. Reynolds Tobacco
Co., a New Jersey Corporation; Philip Morris Incorporated,
a Virginia Corporation; the Tobacco Institute, Petitioners.
Honorable H. Lee Sarokin, United States District Judge for
the District of New Jersey, Nominal Respondent.
 No. 92-5144.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 7, 1992.
Decided Sept. 4, 1992.
As Amended Sept. 17, 1992.
Order on Denial of Rehearing Oct. 8, 1992.
 
 Arlin M. Adams (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for petitioners.
 Marc Z. Edell (argued), Cynthia A. Walters, Budd Larner Gross Rosenbaum Greenberg & Sade, Short Hills, N.J., for respondent.
 Before: GREENBERG, ALITO and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Several important questions are presented in this original petition in mandamus filed by leading tobacco companies. They request us to direct the district court to vacate its order that the crime-fraud exception to the attorney-client, work product and joint defense privileges applies to various documents here, 140 F.R.D. 681, but the primary issue that we must decide is whether the district court properly exercised its reconsideration function under 28 U.S.C. § 636(b)(1)(A) of the Federal Magistrate Act, as amended.
 
 
 2
 The Act provides that "[a] judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law." In exercising its review function under this standard, the district court here considered facts that were not before the magistrate judge.
 
 
 3
 This is not an appeal from final judgment. Rather, it involves a very sensitive issue of discovery that is part of an ongoing personal-injuries action brought under diversity jurisdiction. Because this is a discovery matter, the district court's order is not immediately appealable. Borden Co. v. Sylk, 410 F.2d 843, 845 (3d Cir.1969). We must first decide the extent to which we may reach this issue in proceedings brought under the All Writs Act, 28 U.S.C. § 1651(a), which provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." In re School Asbestos Litig., 921 F.2d 1310, 1313 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991). Petitioners, various tobacco companies who are defendants in the ongoing litigation, insist that matters ordered disclosed by the district court are privileged and that the crime-fraud exception does not apply.
 
 
 4
 We deem it appropriate at the outset to explain the nature of the crime-fraud exception, and to do this we refer to the Supreme Court's recent description of the attorney-client privilege's purpose and the reasons for the exception:
 
 
 5
 We have recognized the attorney-client privilege under federal law, as "the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Although the underlying rationale for the privilege has changed over time, see 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961), courts long have viewed its central concern as one "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn, 449 U.S. at 389, 101 S.Ct. at 682. That purpose, of course, requires that clients be free to "make full disclosure to their attorneys" of past wrongdoings, Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976), in order that the client may obtain "the aid of persons having knowledge of the law and skilled in its practice," Hunt v. Blackburn, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888).
 
 
 6
 The attorney-client privilege is not without its costs. Cf. Trammel v. United States, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." Fisher, 425 U.S. at 403, 96 S.Ct. at 1577. The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection--the centrality of open client and attorney communication to the proper functioning of our adversary system of justice--"ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing." 8 Wigmore, § 2298, p. 573 (emphasis in original); see also Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the "seal of secrecy," ibid., between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime. O'Rourke v. Darbishire, [1920] A.C. 581, 604 (P.C.).
 
 
 7
 United States v. Zolin, 491 U.S. 554, 562-63, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (footnotes omitted).
 
 
 8
 The traditional and practical importance of the privilege and the proper application of the exception are at the heart of petitioners' arguments. In addition to challenging the application of section 636(b)(1), petitioners contend that the district court erred in considering the crime-fraud exception: that it applied an evidentiary standard at odds with that set forth in Zolin and that it compounded its error by quoting publicly, before any review process was completed, portions of petitioners' documents claimed to be privileged. Finally, because of certain statements made by the district court in the opinion accompanying its ruling--statements criticizing the tobacco industry that generated widespread attention in the media--petitioners request that the ongoing district court proceedings be assigned to another judge "to preserve justice and the appearance of impartiality." Mandamus Petition at 3 (hereinafter "Pet.").
 
 I.
 
 9
 Susan Haines, administratrix of the estate of the deceased, Peter F. Rossi, a 40year smoker, filed this personal injury action against petitioners, Liggett Group, Inc., Loew's Theatres, Inc., R.J. Reynolds Tobacco Co., Philip Morris Incorporated and the Tobacco Institute. She alleges claims of product liability, tort and conspiracy and seeks relief under concepts approved in Cipollone v. Liggett Group, Inc., --- U.S. ----, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).
 
 
 10
 As part of her case, Haines seeks discovery of certain documents relating to the Council for Tobacco Research ("the Council" or "CTR"). She argues that these documents are relevant to issues of liability, because they may constitute admissions, may bear on the credibility of parties and witnesses and may support the conspiracy theory.
 
 
 11
 The Council is the successor to the Tobacco Industry Research Committee, which was formed by several cigarette manufacturers to conduct scientific research on potential health hazards from smoking and to disseminate information to the public regarding this research. The Council did not conduct original research; rather, it funded independent research through a grant program directed by the Scientific Advisory Board. Pet. at 12.
 
 
 12
 Following the release of the 1964 Surgeon General's Advisory Committee Report on smoking and health, and the subsequent congressional hearings leading to the enactment of the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331, et seq., the tobacco companies' lawyers advised the companies to fund independent scientific and medical investigations to assist in litigating future claims against the companies. This led to the creation of "CTR special projects," which "were different and separate in procedure, scope, and substance from the research funded by the Advisory Board grant program." Pet. at 13. Each time a research project was proposed that might be of assistance in litigation, the companies consulted with their lawyers and decided, on a project-by-project basis, whether to fund the research as a special project. The approved projects were funded by the Council's accounting department, although some projects were co-funded by other funding institutions.
 
 
 13
 Haines acknowledges that the special projects were "administered, in large part, by attorneys for the cigarette companies." Respondent's Answer to Petition at 13 (hereinafter "Ans."). Haines contends that the documents sought may show that the Council was a fraudulent public relations ploy. While presented as an independent research organization, its actual function was to assist the tobacco industry in various ways. Ans. at 1-2. Haines contends that the special projects department funded research suggesting that no definite link had been established between smoking and disease. Id.
 
 II.
 
 14
 On July 1, 1988, approximately four years after Haines filed her complaint, she served her third discovery request upon petitioners, seeking documents related to the Council and the Council's Special Projects. According to petitioners, respondent was prompted to request the discovery of these documents because of evidence that had been disclosed in Cipollone v. Liggett Group, Inc., 683 F.Supp. 1487 (D.N.J.1988), a related case also pending before the same district judge.
 
 
 15
 On July 5, 1990, in answer to respondent's third discovery request, petitioners claim to have produced:
 
 
 16
 over 2000 responsive documents. Specifically, petitioners produced (1) all correspondence, memoranda, research proposals, and research results prepared by the researchers themselves or others working under their direction; and (2) all correspondence to or from researchers, including correspondence with petitioners or their counsel.
 
 
 17
 Pet. at 5. However, petitioners declined to produce approximately 1,500 documents which, although otherwise responsive, petitioners claimed were privileged as attorney-client communications or attorney work product. Accordingly, petitioners submitted logs identifying those documents.
 
 
 18
 Haines argued that the documents were not privileged communications or work product, and that even if they were, the crime-fraud exception applied, thereby annulling the privilege. On January 29, 1991, the district court appointed then-Special Master Joel Pisano to make a recommendation as to whether the documents withheld by petitioners were the type of documents to which the attorney-client and work product privileges applied. The order provided that the documents were to be treated as privileged "until entry of a final order by the [district judge], and any appeal therefrom." Petitioners' App. Tab B, at 5. However, respondent objected to having the special master decide if the crime-fraud exception applied. While the special master considered whether the privileges were available at all, Magistrate Judge Hedges considered whether he or the special master should decide the question of the applicability of the crime-fraud exception.
 
 
 19
 On May 22, 1991, the magistrate judge sent a letter opinion to the parties indicating that "the crime-fraud exception is an issue which should not be referred to a special master." Id. Tab A. In addition, after reviewing four file folders of documents that the special master had tagged as possibly "bear[ing] on the crime fraud exception," the magistrate judge concluded that he was "not satisfied that plaintiff has made a showing under Zolin sufficient to overcome the attorney-client privilege."
 
 
 20
 Thereafter, on May 29, 1991, Special Master Pisano filed a Report and Recommendation that discussed whether the documents were eligible for the privilege, without regard to the exception. He began by setting forth the factual background to this discovery dispute, noting that the Council had been formed to "coordinat[e] common interest in the tobacco industry, to conduct scientific research on potential health hazards and to function as the industry's organ for disseminating information to the public as the issue developed." Report & Recommendation at 1. However, he observed that, following the Surgeon General's 1964 advisory committee report and the 1964-1965 congressional hearings that led to the enactment of the Cigarette Labeling Act, tobacco companies began funding the Council's special projects, consisting of scientific and medical research "that might be of assistance to develop evidence relevant to the anticipated smoking and health litigation." Id. at 2. He found that these research projects were "conducted by independent scientists affiliated with a variety of academic and research institutions who were not employed by or related to the tobacco industry" and that "[t]hese researchers were permitted to publish the results of their research with credit given to the CTR." Id. at 3-4.
 
 
 21
 Next, he noted that the Council had been forced to retain counsel because of the proliferation of tobacco litigation and the concomitant doubt cast upon the credibility of the Council's projects. As Dr. Colby, the Council's head of research and development, testified, he had become "a person wearing two hats. Number one, [he] was in charge of R & D information; number two, [he] was responsive to the legal department." Id. at 3.
 
 
 22
 Special Master Pisano emphasized that his role was a limited one. He stated that he was not "to investigate or comment upon the defenses which have been pleaded by counsel" in support of the discovery of documents concerning the Council and its special projects: "Rather, I am charged to inspect the body of documentary communication about the CTR special projects and to decide whether they are being legitimately withheld." Id. at 6.
 
 
 23
 After reviewing the legal precepts governing attorney-client and attorney work product privileges, he concluded that--
 
 
 24
 defendants have met their burden of proving that the documents plaintiff seeks to discover were prepared because of litigation that had already commenced and the prospect that future litigation would ensue.
 
 
 25
 More particularly, defendants have made a sufficient showing that the CTR research projects in issue were conducted upon the advice of their counsel for the chief purpose of developing evidence relevant to the existing and anticipated smoking and health litigation and to the legal issues raised by the Congressional hearings that led to the enactment of the Cigarette Labelling Act....
 
 
 26
 The actual documents plaintiff seeks to discover were generated by the communication among defendants' corporate and outside litigating counsel, the communication among counsel and their clients, and counsels' communication with CTR employees. The documents reflect, in the main, discussions concerning the proposed CTR projects, the progress of those projects, the possibility of recommending additional research ideas and the application of the research results to the legal theories available in defense of existing and anticipated litigation. Clearly, the CTR projects and the documents that were created in connection with those projects were part of defendants' legal strategy in defending litigation and are thus privileged.
 
 
 27
 Id. at 8-9. He further determined that the documents sought to be discovered by plaintiff "fall within 'the highly protected category of opinion work product' since the consultation among counsel and their clients concerning the CTR projects encompassed defendants' legal strategy and the evaluation of the strengths and weaknesses of their defense in the existing and anticipated smoking and health litigation." Id. at 9-10 (quoting Sporck v. Peil, 759 F.2d 312, 316 (3d Cir.1985)). For these reasons, Special Master Pisano held that all but eight documents of the 1,500 withheld were protected under either the attorney-client or attorney work product privileges.[1]
 
 A.
 
 28
 Haines appealed to the district court from the magistrate judge's order that the crime-fraud exception did not apply. The court conducted oral argument on July 9, 1991. More than four months later, the court ordered the parties to supply it with materials from the record in Cipollone, including "all excerpts from defendants' counsel in openings, closings or defendants' witnesses which make reference to the purpose, means and results of the research conducted or to be conducted by the Tobacco Institute Research Council and/or the Council for Tobacco Research." The court additionally ordered counsel to "identify in the record the moment when plaintiff's counsel first learned of the existence of the 'Special Projects' division." Petitioners' App. Tab E, at 2.
 
 
 29
 Petitioners wrote to the district judge on December 10, 1991, in response to the court's request for documents and confirmed that they had complied with the court's order. However, petitioners asserted that--
 
 
 30
 the transcript excerpts are outside the record considered by Magistrate Judge Hedges on the motion under review. Moreover, their relevance to the issues in this appeal is not readily apparent. We would request that if these excerpts are going to affect the Court's decision in any manner, the Court should remand to the Magistrate Judge for consideration of the additional material (see Fed.R.Civ.P. 72(a); Local Rule 40D), or permit defendants an opportunity to address whatever questions the Court believes are raised by these materials.
 
 
 31
 Id. Tab F, at 3.
 
 
 32
 On February 6, 1992, the district court issued an opinion and order purportedly addressing the applicability of the crime-fraud exception and not the ultimate merits of the plaintiff's claims, yet the opening paragraphs of the opinion appear to address the merits:
 
 
 33
 In light of the current controversy surrounding breast implants, one wonders when all industries will recognize their obligation to voluntarily disclose risks from the use of their products. All too often in the choice between the physical health of consumers and the financial well-being of business, concealment is chosen over disclosure, sales over safety, and money over morality. Who are these persons who knowingly and secretly decide to put the buying public at risk solely for the purpose of making profits and who believe that illness and death of consumers is an appropriate cost of their own prosperity!
 
 
 34
 As the following facts disclose, despite some rising pretenders, the tobacco industry may be the king of concealment and disinformation.
 
 
 35
 Haines v. Liggett Group, Inc., 140 F.R.D. 681, 683 (D.N.J.1992).
 
 
 36
 The district court considered whether respondent had introduced prima facie evidence that the exception applied, and in particular, whether respondent had "presented evidence which, if believed by the fact-finder, supports [respondent's] theory of fraud." Id. at 692. The court then determined that there was prima facie evidence that the defendants were engaged in an ongoing fraud and that they had obtained attorney assistance to further that fraud through the use of the Council's special projects division. Id. at 697. The court stated that the "only possible conclusion is that the crime-fraud exception applies to these documents" and held that the magistrate judge's conclusion to the contrary was clearly erroneous. Id. To support its finding of fraud, the court included in its published opinion excerpts from five documents found by the special master and the magistrate judge to be privileged. Id. at 695-98.
 
 
 37
 Accordingly, the district court adopted Special Master Pisano's finding that all but six of the documents are eligible for the privilege. The court ordered the defendants to turn over those six documents to the plaintiff. Id. at 697. The district court reversed the magistrate judge's order and found that the crime-fraud exception applied at least to the five documents quoted in its opinion. Id. The court ordered the defendants to turn over the quoted portions of these documents and stated that it would appoint a new special master to review the remaining documents to determine whether each document is subject to the crime-fraud exception. Id.
 
 
 38
 The defendant tobacco companies responded by filing this petition for writ of mandamus.[2] On February 10, 1992, the district court granted an unopposed stay of its order pending review in this court.
 
 III.
 
 39
 Federal courts have the power to issue writs of mandamus or prohibition under the All Writs Act, 28 U.S.C. § 1651(a), which provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."
 
 
 40
 The Court admonishes federal appellate courts to exercise their writ power with caution. Kerr v. United States Dist. Court, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123-24, 48 L.Ed.2d 725 (1976); see DeMasi v. Weiss, 669 F.2d 114, 116-17 (3d Cir.1982). Because the remedy is so extreme, courts should invoke it only "in extraordinary situations." Kerr, 426 U.S. at 402, 96 S.Ct. at 2123. Traditionally, federal courts have used the power "only to confine inferior courts to their lawful jurisdiction or to compel them to exercise authority when they have a duty to do so." DeMasi, 669 F.2d at 117 (citing Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967)). In defining "jurisdiction," the Supreme Court has avoided a "narrow and technical" construction, directing that "only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy." Will, 389 U.S. at 95, 88 S.Ct. at 273 (quoting DeBeers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 217, 65 S.Ct. 1130, 1133, 89 L.Ed. 1566 (1945)).
 
 
 41
 Two important policy considerations support the concept that writs of mandamus should be granted only sparingly. First, mandamus actions " 'have the unfortunate consequence of making the [district court] judge a litigant ...' in the underlying case." Kerr, 426 U.S. at 402, 96 S.Ct. at 2124 (quoting Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 384-85, 74 S.Ct. 145, 149, 98 L.Ed. 106 (1953)). Second, frequent use of writs of mandamus would ignore the important judicial goal of avoiding piecemeal appellate review. Id. at 403, 96 S.Ct. at 2124; DeMasi, 669 F.2d at 117.
 
 
 42
 To ensure the use of writs in only "extraordinary situations," the Supreme Court has established two prerequisites to the issuance of a writ: (1) that petitioner have no other "adequate means to attain the [desired] relief," and (2) that petitioner meet its burden of showing that its right to the writ is "clear and indisputable." Kerr, 426 U.S. at 403, 96 S.Ct. at 2124; see DeMasi, 669 F.2d at 117. Once these two prerequisites are met, the court's decision whether to issue the writ is largely one of discretion. Kerr, 426 U.S. at 403, 96 S.Ct. at 2124. See also In re School Asbestos Litig., 921 F.2d 1310, 1314 (3d Cir.1990).
 
 
 43
 Petitioners argue that they cannot otherwise obtain the desired relief, because an interlocutory appeal will not lie. Moreover, petitioners assert, the district court's order "requires the disclosure of privileged documents reflecting the innermost thoughts of petitioners' counsel on legal strategy encompassing a period of over 15 years. Unless this Court issues a writ of mandamus now, it will be too late: the documents will be released, and it will be impossible to rectify the harm." Pet. at 1.
 
 
 44
 We agree that petitioners have no other "adequate means to attain the [desired] relief," and accordingly we conclude that they have satisfied the first prerequisite in qualifying for mandamus relief. Kerr, 426 U.S. at 403, 96 S.Ct. at 2124; In re School Asbestos Litig., 921 F.2d at 1314.
 
 
 45
 Our discussion must now focus on the second prerequisite: whether their right to the writ is "clear and indisputable." We must inquire first into the nature of the interest at stake. Karl Llewellyn taught that an interest "is a social fact, or factor of some kind, existing [in]dependent of the law. And it has value independent of the law. Indeed, its protection is the purpose of substantive legal rights, of legal rules, of precepts."[3] A particular interest deemed worthy of protection becomes the subject of what Roscoe Pound described as "rules in the narrower sense": "precepts attaching a definite detailed legal consequence to a definite, detailed state of facts."[4]
 
 
 46
 If petitioners assert an interest of this type, we must then inquire if the district court erred in failing to provide adequate safeguards for its protection. This will determine whether petitioners have satisfied the second prerequisite for the writ.
 
 
 47
 The interest here, of course, is extremely important. It concerns attorney-client, attorney work product and joint defense matters, and it goes to the heart of the professional relationship between one trained in the law and the lay person or entity who may bare intimate confidences to the professional so that the professional will be fully informed. It is grounded in ethics, endorsed by centuries of tradition and enforced by codes of professional conduct and professional responsibility. It recognizes that in the adversary system, the professional's strategy, individually or in concert with others, is irrevealable. The command is, "Seal up your lips and give no word but mum:/The business asketh silent secrecy."[5]
 
 
 48
 We therefore must amplify our previous discussion of the legal precepts attending the attorney-client relationship.
 
 IV.
 
 49
 The attorney-client privilege, as the Court has recognized, is the oldest confidential communications privilege known to the common law. Zolin, 491 U.S. at 562. It is therefore not only an interest long recognized by society but also one traditionally deemed worthy of maximum legal protection. "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). The privilege's purpose is to encourage clients to make a full disclosure to their attorneys. Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).
 
 
 50
 Documents within the scope of the attorney-client privilege are "zealously protected." 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2017 (1970) (hereinafter "Wright & Miller"); see Chore-Time Equip., Inc. v. Big Dutchman, Inc., 255 F.Supp. 1020, 1021 (W.D.Mich.1966) ("[I]t generally is acknowledged that the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously."); In re Grand Jury Subpoena Duces Tecum, 391 F.Supp. 1029, 1034 (S.D.N.Y.1975) (where one part of memorandum is privileged and doubts exist as to other parts, doubt resolved in favor of application of privilege).
 
 
 51
 The privilege extends to verbal statements, documents and tangible objects conveyed by both individual and corporate clients to an attorney in confidence for the purpose of any legal advice. 8 John H. Wigmore, Evidence § 2292 (John T. McNaughton rev. ed. 1961); see also United States v. Liebman, 742 F.2d 807, 810 (3d Cir.1984). Although the privilege belongs to the client, and only the client may waive it, an attorney may assert the privilege on the client's behalf. McCormick on Evidence § 92 (John W. Strong 4th ed. 1992). Moreover, the canons of ethics make the attorney's common law obligation to maintain the secrecy of his communications with his client a professional mandate. See Model Rules of Professional Conduct Rule 1.6 (1983) (lawyer shall not reveal information relating to representation of client unless client consents after consultation); Model Code of Professional Responsibility DR 4-101 (1980) (lawyer is prohibited from revealing secrets or confidences of client); see also Klitzman, Klitzman & Gallagher v. Krut, 744 F.2d 955, 960-61 (3d Cir.1984).
 
 
 52
 But, it bears repeating that--
 
 
 53
 the reason for that protection--the centrality of open client and attorney communication to the proper functioning of our adversary system of justice--"ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing."
 
 
 54
 Zolin, 491 U.S. at 562-63, 109 S.Ct. at 2626. We must always keep in mind that the purpose of the crime-fraud exception is to assure that the "seal of secrecy" between lawyer and client does not extend to communications from the lawyer to the client made by the lawyer for the purpose of giving advice for the commission of a fraud or crime. The seal is broken when the lawyer's communication is meant to facilitate future wrongdoing by the client. Where the client commits a fraud or crime for reasons completely independent of legitimate advice communicated by the lawyer, the seal is not broken, for the advice is, as the logicians explain, non causa pro causa. The communication condemned and unprotected by the attorney-client privilege is advice that is illicit because it gives direction for the commission of future fraud or crime. The advice must relate to future illicit conduct by the client; it is the causa pro causa, the advice that leads to the deed.
 
 
 55
 Petitioners clearly have an interest deserving of protection. We must now consider whether the district court adequately protected it.
 
 V.
 
 56
 Petitioners contend that the district court did not follow the dictates of 28 U.S.C. § 636(b)(1)(A) in the exercise of its review function. Under subparagraph (A) the district court is permitted to designate a magistrate judge to hear and determine any pretrial matters before the court, including discovery matters. However, the district judge may "reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law." Id. The matters handled by magistrate judges under subparagraph (A) are generally described a "non-dispositive." Rule 72(a), Fed.R.Civ.P. advisory committee note; 12 Wright & Miller § 3076.5 (Supp.1992).
 
 
 57
 Subparagraph (A) must be contrasted with the authority vested in magistrate judges under subparagraphs (B) and (C) for "dispositive matters":
 
 
 58
 (B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.
 
 
 59
 (C) the magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties. Within ten days after being served with a copy, any party may serve and file written objections to [the magistrate judge's] proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.
 
 
 60
 The clear and unambiguous language of the statute thus provides for different standards of review when the district court "reconsiders" rulings of the magistrate judges in non-dispositive matters under (b)(1)(A) and when it considers "written objections" to "proposed findings and recommendations" of the magistrate judge in dispositive matters under (b)(1)(B) and (C). Under (b)(1)(A), the standard of review is circumscribed: The district court is bound by the clearly erroneous rule in findings of facts; the phrase "contrary to law" indicates plenary review as to matters of law. See also Rule 72(a), Fed.R.Civ.P. ("Nondispositive Matters"). Under (b)(1)(B) and (C), the district court is permitted to make a de novo determination of proposed findings and recommendations, may accept, reject or modify, in whole or in part, the findings and recommendations, and "may also receive further evidence." See also Rule 72(b), Fed.R.Civ.P. ("Dispositive Motions and Prisoner Petitions").
 
 
 61
 The distinction is important here, because the district judge was reviewing a subparagraph (A) non-dispositive matter and not a dispositive matter under subparagraphs (B) and (C). It is a distinction with a difference. In a subparagraph (A) matter, the district court is not permitted to receive further evidence; it is bound by the clearly erroneous rule in reviewing questions of fact.
 
 A.
 
 62
 It is not disputed that the district court here considered extensive evidence and materials from the record in Cipollone v. Liggett Group, Inc., 683 F.Supp. 1487 (D.N.J.1988), that were not considered by the magistrate judge. We previously outlined this in Part II(A). See also Haines, 140 F.R.D. at 688. The record before the magistrate judge included: the plaintiff's brief; non-privileged documents submitted by Haines pertaining to "special projects"; legal memoranda and certain excerpts from Cipollone testimony regarding the relationship between the Council and industry attorneys; plaintiff's entire brief on the intentional tort issue submitted in Cipollone in response to defendants' motion for a directed verdict; representative documents from the Cipollone trial record; briefs and appendices submitted by the defendants; the disputed special projects documents submitted for in camera review; and the affidavit of Special Master Pisano identifying representative documents pertinent to the crime-fraud issue. Ans. at 8.
 
 
 63
 Haines argues that inasmuch as extensive portions of the Cipollone trial record were presented to the magistrate judge, it was perfectly proper for the district judge who had presided over the Cipollone trial to consider all matters from this trial. This argument requires an analysis of the jurisprudential underpinnings of the clearly erroneous standard of review and a special inquiry whether a reviewing court in the common law tradition may consider evidence that was not before the trial tribunal.
 
 VI.
 
 64
 It is undisputed that the proper standard of review for discovery orders is the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); Rule 72(a), Fed.R.Civ.P.; see also Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1113 (3d Cir.1986); John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 662 (3d Cir.1986), cert. denied, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987).
 
 
 65
 The Seventh Amendment has controlling force in federal jury cases: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." Most state constitutions have similar provisions.[6] So long as there is some evidence from which the jury could arrive at the finding by a process of reasoning, the jury's findings of fact, especially those resolving conflicts in testimony, will not be disturbed.
 
 
 66
 Facts found by a judge alone need a stronger evidentiary base. Under Rule 52(a), Fed.R.Civ.P., the findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." "Clearly erroneous" has been interpreted to mean that a reviewing court can upset a finding of fact, even when supported by some evidence, but only if the court has "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). More than 20 years ago, this was construed by us to mean that the appellate court must accept the factual determination of the fact finder unless that determination "either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data," Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir.1972), and we have consistently adhered to this formula. See, e.g., United States v. Antoon, 933 F.2d 200, 204 (3d Cir.1991), American Home Prod. v. Barr Lab., 834 F.2d 368, 371 (3d Cir.1987), cert. denied, --- U.S. ----, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991).
 
 
 67
 Although there is a distinction between the sanctity of jury fact-finding protected by the Seventh Amendment and the extremely limited review of facts found by a judge permitted under the clearly erroneous rule, in neither event does common law tradition permit a reviewing court to consider evidence which was not before the tribunal of the first instance. Indeed, prohibiting consideration of other evidence on appeal that is not before the tribunal of the first instance is a basic difference that distinguishes appellate courts that operate under the common law tradition and those that follow the civil law tradition in Continental Europe, Latin America and the sole civil law jurisdiction in this country, the state of Louisiana.
 
 
 68
 Civil law tradition permits re-examination of facts through the courts of the second instance. "The appeal permits a thorough overhaul of the case, extending to a retaking of old, as well as the taking of new, testimony and the exploration of issues of law that were not raised in the first instance proceedings." Arthur T. Von Mehren & James R. Gordley, The Civil Law System 102 (2d ed. 1977). This takes place in the intermediate courts of appeals, e.g., the French cour d'appel, the German Oberlandesgericht, and the Italian corte d'appello. Beyond the court of the second instance, the appeal to the final court is restricted to matters of law only--in France, a pourvoi en cassation, in Germany, a Revision, and in Italy, a recorso in cassazione.
 
 
 69
 Similarly, there is generous review of facts in appeals from administrative agencies to the specialized courts. In civil cases in Louisiana, our only state that traces its judicial process to the Napoleonic Code of France, the state's courts of appeal (the courts of second instance) may review facts.[7] The Supreme Court of Louisiana, following the civil law tradition, reviews questions of law only.
 
 
 70
 Accordingly, because in fulfilling the statutory "clearly erroneous" review function in reviewing the facts found by the magistrate judge, the district court here considered portions of the record in Cipollone that were not in the record before the magistrate judge, its determination that the magistrate judge's findings of fact were clearly erroneous cannot stand. By statute, the district court was not allocated the competence to do more than perform the clearly erroneous review function. Neither in the language of section 636(b)(1)(A) nor in its legislative history was the district court anointed with such authority. The magistrate judge was to be analogous to "a court of limited jurisdiction which would be roughly the equivalent of a municipal court in some state systems.... The standard of 'clearly erroneous or contrary to law' is consistent with the accepted and existing practice...." H.Rep. No. 94-1609, 94th Cong., 2d Sess. 8-9, reprinted in 1976 U.S.C.C.A.N. 6162, 6168-69. To consider fresh evidence and materials constituted reversible error that may find relief in the petition for mandamus.
 
 
 71
 We therefore conclude that petitioners have satisfied their high burden under the second prong of the mandamus test enunciated in Kerr, 426 U.S. at 403, 96 S.Ct. at 2124, that they demonstrate that their right to the writ is "clear and indisputable." Because the critical conclusion that a crime-fraud exception to the attorney-client privilege exists was based on improper consideration of evidence that was not before the magistrate judge, the writ will direct that the district court's order and accompanying opinion be vacated insofar as it held that the crime-fraud exception precludes the application of the privilege.
 
 VII.
 
 72
 In an alternative argument supporting their request for mandamus relief, petitioners contend that the district court used an incorrect legal standard in determining that the crime-fraud exception applied. Because we have decided that mandamus relief does lie for another reason, it would be possible to dispose of the petition without meeting this issue. In the context of these proceedings, however, where the cause is remanded for further consideration, we deem it advisable to discuss for future guidance the appropriate burdens and procedures in asserting the privilege or an exception thereto. This court has not had occasion to decide the procedural niceties of matters concerning an exception to the privileges asserted by petitioners here, and we do so now.
 
 
 73
 We have concluded that the district court here did not err in allocating the appropriate burdens and in defining the quantum of proof necessary. To explain our decision, it will be necessary first to analyze the particular privileges asserted here and to explain the different procedures necessary to establish an exception to the privilege and to justify an in camera review of proffered documents.
 
 A.
 
 74
 As previously discussed in greater detail, the attorney-client privilege covers "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). A party seeking the protection of the work product privilege must show that the materials were prepared in "the course of preparation for possible litigation." Hickman v. Taylor, 329 U.S. 495, 505, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947). This court has accorded an attorney's work product almost absolute protection from discovery, because "any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases." Sporck v. Peil, 759 F.2d 312, 316 (3d Cir.), cert. denied, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985).
 
 
 75
 Petitioners assert also that the joint defense privilege applies here. Some explanation of this concept is in order. The attorney-client privilege protects confidential communications made to an attorney in his or her professional capacity, in those instances in which a strict relation of attorney and client exists. Metalsalts Corp. v. Weiss, 76 N.J.Super. 291, 297, 184 A.2d 435, 438-39 (1962). This protection has been extended to communications between different persons or separate corporations when the communications are "part of an on-going and joint effort to set up a common defense strategy." Eisenberg v. Gagnon, 766 F.2d 770, 787 (3d Cir.), cert. denied, 474 U.S. 946, 109 S.Ct. 342, 88 L.Ed.2d 290 (1985). "In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort and (3) the privilege has not been waived." Matter of Bevill, Bresler & Schulman Asset Management, 805 F.2d 120, 126 (3d Cir.1986). See also In re State Comm'n of Investigation Subpoena No. 5441, 226 N.J.Super. 461, 466-67, 544 A.2d 893, 896, cert. denied, 113 N.J. 382, 550 A.2d 484 (1988); Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146, 1172 (D.S.C.1974). This joint defense privilege enables counsel for clients facing a common litigation opponent to exchange privileged communications and attorney work product in order to adequately prepare a defense without waiving either privilege. Western Fuels Ass'n, Inc. v. Burlington N. R.R., 102 F.R.D. 201, 203 (D.Wyo.1984).
 
 
 76
 As we have seen, these privileges are not absolute. In Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933), the Court acknowledged the importance of the attorney-client privilege, but also held: "The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." More recently, as we have previously observed, the Court reiterated that the attorney-client privilege "does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." United States v. Zolin, 491 U.S. 554, 562-63, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989).
 
 B.
 
 77
 Petitioners argue that, in considering whether the exception applies, the district court imposed on respondent an overly lenient burden of proof.
 
 
 78
 In Clark, the Court established the evidentiary standard for application of the crime-fraud exception to the attorney-client privilege:
 
 
 79
 There must be a showing of a prima facie case sufficient to satisfy the judge that the light should be let in....
 
 
 80
 To drive the privilege away, there must be "something to give colour to the charge;" there must be "prima facie evidence that it has some foundation in fact." When the evidence is supplied, the seal of secrecy is broken.
 
 
 81
 289 U.S. at 14-15, 53 S.Ct. at 469 (footnote and citations omitted).
 
 
 82
 In matters referring to fraud or crime generally we have required that the party seeking discovery must make a prima facie showing of fraud or crime. See, e.g., In re Impounded Case (Law Firm), 879 F.2d 1211, 1214 (3d Cir.1989); In re Grand Jury Proceedings (FMC), 604 F.2d 798, 802 (3d Cir.1979). However, we have not clearly defined the contours for a prima facie showing.
 
 
 83
 The district court here carefully analyzed the definitions developed by other courts of appeals. The Court of Appeals for the Fifth Circuit has stated that prima facie evidence is: " '[evidence] [s]uch as will suffice until contradicted and overcome by other evidence ... [a] case which has proceeded upon sufficient proof to that stage where it will support [a] finding if evidence to the contrary is disregarded.' " In re International Sys. & Controls Corp., 693 F.2d 1235, 1242 (5th Cir.1982) (adopting definition contained in Black's Law Dictionary (4th ed. 1968)).
 
 
 84
 The Court of Appeals for the Second Circuit has explained its standard in detail:
 
 
 85
 In In re John Doe Corp., we referred to the burden on the party seeking to overcome the privilege in terms of showing probable cause to believe that a crime or fraud had been committed and that the communications were in furtherance thereof. [675 F.2d 482, 491 & n. 7 (2d Cir.1982) ]. Other circuits have referred to the burden in terms of the need to make a prima facie showing. See, e.g., In re International Systems [ & Controls Corp. Sec. Litig., 693 F.2d 1235, 1242 (5th Cir.1982) ]; In re Grand Jury Proceedings, 689 F.2d 1351, 1352 (11th Cir.1982); In re Sealed Cases, [676 F.2d 793, 814-15 (D.C.Cir.1982) ]. As a practical matter, there is little difference here between the two tests. Both require that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.
 
 
 86
 In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1039 (2d Cir.1984). See also Matter of Feldberg, 862 F.2d 622, 626 (7th Cir.1988) (prima facie evidence is evidence sufficient to require explanation by party asserting privilege).
 
 
 87
 Based on its analysis of the various standards applied by the courts of appeals, the district court concluded that "all of these proposed standards amount to the same basic proposition--has the party seeking discovery presented evidence which, if believed by the fact-finder, supports plaintiff's theory of fraud?" 140 F.R.D. at 692. We interpret this statement to mean that the party seeking discovery must present evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crimefraud exception were met. Based on this interpretation, we believe that the district court's explanation of the burden of proof was correct. The court's opinion reflects that it carefully analyzed the various views on prima facie evidence announced by other courts of appeals and adopted a workable standard. We are satisfied with the explanation of a prima facie case offered by the district court here.
 
 C.
 
 88
 The district court in this case correctly observed that "the decision to engage in in camera review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal." 140 F.R.D. at 690. The court agreed with the magistrate judge that Haines had made a sufficient showing to warrant in camera review. Id.
 
 
 89
 This determination is consistent with the Court's teachings in Zolin. The court noted that " 'in camera inspection ... is a smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure.' " 491 U.S. at 572, 109 S.Ct. at 2631 (quoting David J. Fried, Too High A Price for Truth: The Exception to the Attorney-Client Privilege for Contemplated Crimes and Frauds, 64 N.C.L.Rev. 443, 467 (1986)). The Court thus imposed a lesser evidentiary burden:
 
 
 90
 Before engaging in in camera review to determine the applicability of the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' Caldwell v. District Court, 644 P.2d 26, 33 (Colo.1982), that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.
 
 
 91
 Once that showing is made, the decision whether to engage in in camera review rests in the sound discretion of the district court.
 
 
 92
 Id.
 
 D.
 
 93
 Petitioners argue that the district court applied the same standard in determining whether in camera review is appropriate and whether the crime-fraud exception applies. They contend that Zolin requires a lower standard of proof to trigger in camera review. Pet. at 22-23. The obvious corollary is that a more stringent burden be imposed when considering the ultimate question whether the exception applies.
 
 
 94
 We note some similarity between the two standards. The Court stated that in camera review is appropriate upon " 'a showing of a factual basis adequate to support a good faith belief by a reasonable person' ... that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." Zolin, 491 U.S. at 572, 109 S.Ct. at 2631. The district court here concluded that the burden necessary to establish the exception is met if "the party seeking discovery [has] presented evidence which, if believed by the fact-finder, supports plaintiff's theory of fraud." 140 F.R.D. at 692. The Court has not yet clarified the distinction. 491 U.S. at 563 & n. 7, 109 S.Ct. at 2627.
 
 
 95
 But at a very minimum, we must recognize that the objectives of the two proceedings are completely different. One merely seeks in camera examination of documents by the court; this is a comparatively non-dispositive procedural way station. The other seeks to break the seal of a highly protected privilege. Because this cause will be remanded, we comment briefly on the procedures necessary in the two proceedings.
 
 
 96
 For in camera inspection, it would be sufficient for the district court, in its discretion, to consider only the presentation made by the party challenging the privilege. The court may decide on this submission alone whether a factual basis is present to support a good faith belief by a reasonable person that the materials may reveal evidence of a crime or fraud.
 
 
 97
 Deciding whether the crime-fraud exception applies is another matter. If the party seeking to apply the exception has made its initial showing, then a more formal procedure is required than that entitling plaintiff to in camera review. The importance of the privilege, as we have discussed, as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege. See Pet. at 33-34. We are concerned that the privilege be given adequate protection, and this can be assured only when the district court undertakes a thorough consideration of the issue, with the assistance of counsel on both sides of the dispute. See Matter of Feldberg, 862 F.2d at 626 (after prima facie showing that exception applies, party asserting privilege should have opportunity to rebut; "[i]f the court finds the explanation satisfactory, the privilege remains.").
 
 
 98
 We therefore must agree with petitioners' contention that where a fact finder undertakes to weigh evidence in a proceeding seeking an exception to the privilege, the party invoking the privilege has the absolute right to be heard by testimony and argument.[8]
 
 E.
 
 99
 This, too, must be said. Because of the sensitivity surrounding the attorney-client privilege, care must be taken that, following any determination that an exception applies, the matters covered by the exception be kept under seal or appropriate court-imposed privacy procedures until all avenues of appeal are exhausted. Regrettably this protection was not extended by the district court in these proceedings. Matters deemed to be excepted were spread forth in its opinion and released to the general public. In the present posture of this case, by virtue of our decision today, an unfortunate situation exists that matters still under the cloak of privilege have already been divulged. We should not again encounter a casualty of this sort.
 
 VIII.
 
 100
 We now come to a most agonizing aspect of this case. Petitioners, representing the tobacco industry, request that this court exercise its supervisory powers to remove the district court judge from this case and to assign it to another judge. They argue that he is so prejudiced against them that they cannot hope to get a fair trial. Although we previously denied this relief in another context, Cipollone v. Liggett Group, Inc., 822 F.2d at 347, the present complaint focuses on statements contained in the opinion that is the subject of this petition. The opinion begins:
 
 
 101
 In the light of the current controversy surrounding breast implants, one wonders when all industries will recognize their obligation to voluntarily disclose risks from the use of their products. All too often in the choice between the physical health of consumers and the financial well-being of business, concealment is chosen over disclosure, sales over safety, and money over morality. Who are these persons who knowingly and secretly decide to put the buying public at risk solely for the purpose of making profits and who believe that illness and death of consumers is an appropriate cost of their own prosperity!
 
 
 102
 As the following facts disclose, despite some rising pretenders, the tobacco industry may be the king of concealment and disinformation.
 
 
 103
 140 F.R.D. at 683. The press reported these remarks prominently. A front-page story appeared in the New Jersey Star Ledger under the headline:
 
 
 104
 JUDGE SAYS TOBACCO FIRMS CONCEALED SMOKING RISKS
 
 
 105
 New Jersey Star Ledger, Feb. 7, 1992, at 1. The court's accusations were reported throughout the country in other newspapers, including the New York Times, the Wall Street Journal, the Washington Post, the Chicago Tribune and the Los Angeles Times. Pet. at 44-48; Petitioners' App. Tab P.
 
 
 106
 The right to trial by an impartial judge "is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). To fulfill this requirement--and to avoid both bias and the appearance of bias--this court has supervisory authority to order cases reassigned to another district court judge. Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Therein we stated:
 
 
 107
 Impartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system. In Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968), the United States Supreme Court stated: "[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias."
 
 
 108
 671 F.2d at 789. See also Nicodemus v. Chrysler Corp., 596 F.2d 152, 157 (6th Cir.1979); United States v. Robin, 553 F.2d 8, 10-11 (2d Cir.1977) (en banc) (per curiam). Reassignment is appropriate to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." United States v. Torkington, 874 F.2d 1441, 1447 (11th Cir.1989).
 
 
 109
 The district judge in this case has been a distinguished member of the federal judiciary for almost 15 years and is no stranger to this court; he is well known and respected for magnificent abilities and outstanding jurisprudential and judicial temperament. On the basis of our collective experience, we would not agree that he is incapable of discharging judicial duties free from bias or prejudice. Unfortunately, that is not the test. It is not our subjective impressions of his impartiality gleaned after reviewing his decisions these many years; rather, the polestar is "[i]mpartiality and the appearance of impartiality."
 
 
 110
 The final decision to be rendered by an eventual jury here is whether petitioners, consisting of leading members of the tobacco industry, conspired to withhold information concerning the dangers of tobacco use from the general public. The plaintiff seeks to prove that petitioners participated in an organized concealment of potential health hazards. This, we repeat, is the ultimate issue to be determined by a jury, as fact finders, after appropriate instructions given them by the trial judge.
 
 
 111
 Measured against these precepts, it is impossible for us to vindicate the requirement of "appearance of impartiality" in view of the statements made in the district court's prologue to its opinion. As we did in Lewis, we conclude that the appearance of impartiality will be served only if an assignment to another judge is made, and we will, pursuant to our supervisory power, so direct.
 
 
 112
 The district judge to whom this case is assigned on remand may undertake a fresh reconsideration of the magistrate judge's order on the basis only of the record before the magistrate judge; alternatively, in light of our discussion here of the appropriate burdens of persuasion and going forward with the evidence, the district judge, in the exercise of his or her discretion, may remand the proceedings to the magistrate judge for a reconsideration consistent with the foregoing discussion.
 
 IX.
 
 113
 The petition for a writ of mandamus will be granted directing a vacating of the order of the district court finding that the crime-fraud exception to the attorney-client, work product and joint defense privileges applied in several particulars, which order had reversed the order of the magistrate judge. The Clerk is directed to forward a copy of this opinion and the judgment of this court to the chief judge of the District Court for the District of New Jersey with the direction that the within proceedings be assigned to another district judge.
 
 
 114
 Before SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, COWEN, NYGAARD, ALITO, ROTH, and ALDISERT, Circuit Judges.SUR PETITION FOR REHEARING
 
 
 115
 The petition for rehearing filed by the Respondent in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 116
 Chief Judge SLOVITER would grant rehearing by the court in banc.
 
 
 
 [1]
 Petitioners have withdrawn their claims of privilege in two of these eight documents. Report & Recommendation at 16
 
 
 [2]
 This is the third such petition filed in this case and related proceedings. Cipollone v. Liggett Group, Inc., 822 F.2d 335 (3d Cir.) (writ denied), cert. denied, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987); Cipollone v. Liggett Group, Inc., 785 F.2d 1108 (3d Cir.1986) (writ granted)
 
 
 [3]
 Karl Llewellyn, A Realistic Jurisprudence--The Next Step, 30 Colum.L.Rev. 431, 441 (1930) (footnote omitted); see also Ruggero J. Aldisert, The Judicial Process 615 (1976)
 
 
 [4]
 Roscoe Pound, Hierarchy of Sources and Forms in Different Systems of Law, 7 Tul.L.Rev. 475, 476 (1933)
 
 
 [5]
 William Shakespeare, The Second Part of King Henry the Sixth act I, sc. 2
 
 
 [6]
 See, e.g., Del. Const. of 1897, art. I, § 4; N.J. Const. of 1947, art. I, § 9 (amended 1973); Pa. Const. art. I, § 6 (1971)
 
 
 [7]
 The Louisiana Constitution provides:
 Scope of Review. Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts.
 La. Const. art. V, § 10(B) (amended 1990).
 In Brown v. Avondale Shipyards Inc., 413 So.2d 183, 184 (La.Ct.App.1982), the court observed:
 [W]e point out that our constitution, Article V Section 10(B) provides that the scope of appellate review extends to both law and facts. The case of Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) requires us to examine the entire record in our appellate review.
 In Arceneaux, the Louisiana Supreme Court explained:
 "Manifestly erroneous," in its simplest terms, means "clearly wrong." ... Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous).
 
 
 [365]
 So.2d at 1333
 Nevertheless, generally speaking, in Louisiana, the trial court's findings of fact, particularly when they are dependent upon credibility of witnesses, are entitled to great weight and will not be disturbed on appeal in the absence of manifest error. See, e.g., Echizenya v. Armenio, 354 So.2d 682, 684 (La.Ct.App.), writ refused, 356 So.2d 1006 (La.1978); Rinker v. Rinker, 414 So.2d 837, 838 (La.Ct.App.1982).
 
 
 [8]
 We confine our discussion regarding the appropriate procedures to be followed in ascertaining the applicability of the crime-fraud exception to the civil context and intimate no view as to whether the same procedures should be used in the grand jury context