**ROYAL SURPLUS LINES INSURANCE COMPANY, Plaintiff,**

v.

**SOFAMOR DANEK GROUP, INC. and Youngwood Medical Specialties, Inc. Defendants.**

No. 97–2499 GV.

United States District Court,
W.D. Tennessee,
Western Division.

Oct. 7, 1999.

**508**

Linda J. Mowles, Alan M. Parker, David L. Beck, Michael S. Pemberton, Lewis King Krieg Waldrop & Cantron, Knoxville, TN, Michael B. Neal, Krivcher Magids, Memphis, TN, Aaron Wyckoff, Lewis King Krieg Waldrop & Catron PC, Nashville, TN, for Royal Surplus Lines Insurance Company, plaintiffs.

William C. Bateman, Jr., Scott B. Peatross, Bateman Gibson & Childers, Memphis, TN, William P. Kardaras, Peter W. Kardaras, Cooper Kardaras & Scharf LLP, New York, NY, for Insurance Company of the State of Pennsylvania, New Hampshire Insurance Company, intervenor plaintiffs.

Lee J. Chase, III, Larry Montgomery, Glankler Brown Gilliland Chase Robinson & Raines, Memphis, for Sofamor Danek Group, Inc., defendants.

## ORDER ON PRODUCTION OF DOCUMENTS AFTER *IN CAMERA* REVIEW

VESCOVO, United States Magistrate Judge.

Before the court are documents produced to the court by nonparty Sedgwick James of Tennessee, Inc. ("Sedgwick") for *in camera* inspection pursuant to this court's discovery orders dated March 17, 1998 ("the March Order"), and July 31, 1998 ("the July Order"), affirmed by order of the district court on August 5, 1999. Sedgwick and defendant Sofamor Danek Group, Inc. ("SDG") oppose production of these documents.

As this court has noted in its previous orders, this lawsuit involves a dispute regarding the extent of coverage provided by an insurance policy issued by the plaintiff, Royal Surplus Lines Insurance Company ("Royal"), to SDG against various risks associated with SDG's products. Royal issued the policy on November 24, 1995, and on February 16, 1996, sent SDG a reservation of rights letter. The central question in this lawsuit is whether the policy issued by Royal obligates it to provide coverage and pay the defense costs associated with certain orthopedic bone screw claims against SDG.

In its complaint, Royal alleges, among other things, that SDG engaged in intentional misrepresentations and/or omissions during the policy application process. In general, Royal claims that SDG and Sedgwick concealed material information, provided false information, and failed to correct and update information during the negotiation process. Royal has identified five specific instances of alleged misrepresentation or omission:

1. SDG's failure to advise Royal that SDG would allocate Multi–District Litigation ("MDL") General Litigation Expenses to Royal;

2. SDG's failure to report the magnitude of new claims received during the application period;

3. SDG's misrepresentation of the level of current and future legal expenses;

4. SDG's misrepresentation of the status of the class action; and

5. SDG's misrepresentation of the purpose and effect of the Designated Product Exclusion.

The negotiations between the parties for placement of the Royal policy were facilitated by Sedgwick, SDG's insurance broker, and Tri–City Brokerage, Inc., a surplus insurance broker that was familiar with Royal. In the course of discovery in this case, Royal has sought the production of a number of documents in the possession of Sedgwick because of its involvement in securing SDG's multi-layer product liability insurance program, particularly the Royal policy.

Sedgwick initially refused to produce approximately 205 documents, asserting theo-

ries of attorney-client privilege, work product, and joint defense as a bar to disclosure. After negotiations between the parties whittled the number of disputed documents to approximately forty, this court ruled on most of the remaining documents. Several documents remained hotly in dispute, however. Sedgwick maintained that the remaining documents were covered by attorney-client privilege while Royal argued that many of the documents were either non-privileged or fell within the crime-fraud exception to the privilege.

After determining that Royal had made an initial showing of a factual basis adequate to support a good faith belief that the documents sought might reveal evidence of fraud, the court ordered Sedgwick to produce certain documents for *in camera* inspection to determine if the documents were indeed protected by the attorney-client privilege, and if so, whether the crime-fraud exception applied. Sedgwick produced the documents to the court *in camera* on August 23, 1999. After reviewing the documents *in camera*, the court GRANTS in part and DENIES in part Royal's motion to compel production as to these documents.

## DISCUSSION

The requirements for invocation of the attorney-client privilege have been set forth in the previous orders in this case, familiarity with those orders is presumed, and the requirements will not be repeated here. (March Order at 6–21; July Order at 7–21.)

The attorney-client privilege is a hallowed principle of Anglo–American law, standing as "the oldest of the testimonial privileges protecting confidential communications." EDNA SELAN EPSTEIN, SECTION OF LITIG., A.B.A., THE ATTORNEY–CLIENT PRIVILEGE AND THE WORK–PRODUCT DOCTRINE 2 (3d ed.1997) (noting that the attorney-client privilege dates to the time of Queen Elizabeth I); *see also Upjohn v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Given the history of the attorney-client privilege

and its status as one of "the bastions of ordered liberty," EPSTEIN at 2, courts are properly hesitant to intrude upon the private communications of clients and their attorneys. Nevertheless, as previously noted, the privilege is not absolute, and in some situations, society's interest in preventing ongoing illegal conduct outweighs its interest in protecting confidential communications. (July Order at 22.) The crime-fraud exception to the attorney-client privilege is one such situation.

The question now facing the court is what standard of proof is required before a court can order the production of a document under the crime-fraud exception.[1] While Tennessee courts have addressed the crime portion of the crime-fraud exception to the attorney-client privilege, no reported decisions from Tennessee have squarely confronted the fraud portion of the exception, nor have the Tennessee courts addressed the evidentiary standard necessary to satisfy the exception in order to compel the production of documents. In the absence of any clear rule of law in Tennessee, this court must once again fashion a rule of decision that Tennessee would most likely adopt. (*See* March Order at 9; July Order at 14–15.)

As this court noted in its previous orders, Tennessee courts frequently look to state and federal common law when fashioning the contours of the attorney-client privilege. (July Order at 14–15.) *See Federal Ins. Co. v. Arthur Anderson & Co.,* 816 S.W.2d 328, 330 (Tenn.1991) (noting "though presently protected by statute, the rule is rooted in the common law of this State...."); *State v. Bobo,* 724 S.W.2d 760 (Tenn.Crim.App.1981) (reviewing authority from other jurisdictions and citing various treatises and federal common law in determining that the privilege did not prevent disclosure of the identity of a client). In fashioning a rule of decision regarding the crime-fraud exception, this court has reviewed decisions from a number of other jurisdictions including the Sixth Circuit. *See, e.g., In re Grand Jury Proceed-*

1. Although, as will be seen herein, the ultimate decision as to each document does not turn on the crime-fraud exception, the court will nevertheless discuss the parameters of the exception in general.

*ings,* 183 F.3d 71 (1st Cir.1999) (refusing to explicitly adopt any particular standard for analyzing the crime-fraud exception, but holding that the exception applied under the facts of that case); *In re Grand Jury Proceedings,* 87 F.3d 377, 381 (9th Cir.1996) (holding that the appropriate standard for invoking the crime-fraud exception was whether the district court found "reasonable cause to believe" that the client used the attorney's services to further an ongoing unlawful scheme); *Haines v. Liggett Group Inc.,* 975 F.2d 81, 95–96 (3d Cir.1992) (holding that the proponent of exception must show "evidence ... which if believed ... would be sufficient to support a finding that the elements of the crime-fraud exception were met"); *In re Feldberg,* 862 F.2d 622, 625–26 (7th Cir.1988) (holding that the appropriate test is whether there is enough evidence to support further inquiry, not whether the evidence would be sufficient to support a verdict); *In re Grand Jury Investigation,* 842 F.2d 1223, 1226 (11th Cir.1987) (similar standard to 3d Circuit); *In re Antitrust Grand Jury,* 805 F.2d 155, 165–66 (6th Cir. 1986) (adopting a "probable cause" standard similar to that of the 2d Circuit); *In re Sealed Case,* 754 F.2d 395, 399 (D.C.Cir.1985) (similar standard to 3d Circuit); *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1039 (2d Cir.1984) ("probable cause" standard); *In re Grand Jury Proceedings,* 641 F.2d 199, 203 (5th Cir.1981) ("strong suspicion" is not enough to invoke exception). The Sixth Circuit and Tennessee have similar analyses with respect to whether a planned crime vitiates the attorney-client privilege as well as the same common law definitions of the privilege. *See United States v. Goldfarb,* 328 F.2d at 280, 281 (6th Cir.1964). Based on its analysis of the various decisions from other courts, this court concludes that the Sixth Circuit's standard for evaluating the crime-fraud exception provides a balance of interests most similar to that which the Tennessee Supreme Court would adopt. Therefore, this court will follow the Sixth Circuit test in applying the crime-fraud exception.

■ The Sixth Circuit has delineated the quantum of proof necessary to establish the application of the crime fraud exception to defeat the attorney-client privilege. First, the proponent of the exception "must make a prima facie showing that a sufficiently serious crime or fraud occurred to defeat the privilege." *In re Antitrust Litigation,* 805 F.2d 155, 164 (6th Cir.1986). Second, the proponent of the exception "must establish some relationship between the communication at issue and the prima facie violation." *Id.* To establish a prima facie case, the proponent of the exception must show that there are sufficient facts for "a prudent person [to] have a reasonable basis to suspect the perpetration of a crime or fraud." *Id.* at 166 (quoting with approval *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1039 (2d Cir.1984)).

Sedgwick, in its Notice of Producing Documents for *In Camera* Inspection, urges a more stringent formulation for determining when a prima facie showing of the commission of a fraud has been established. Relying on Third Circuit precedent, *Haines v. Liggett,* 975 F.2d 81, 95–96 (3d Cir.1992), Sedgwick argues that the appropriate standard is whether the "evidence ... if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met." *Id.*

As evidenced from the recent case of *United States v. Collis,* 128 F.3d 313 (6th Cir. 1997), the Sixth Circuit has not adopted the Third Circuit approach set forth in *Haines v. Liggett,* but rather continues to apply the two-prong approach formulated in *In Re Antitrust Grand Jury.* In *Collis,* a criminal case, the defendant provided a forged letter to his attorney for submission to the court in connection with sentencing in a supervised release violation case. The attorney, unaware of the forgery, submitted the document. The defendant was subsequently charged with obstruction of justice. At the trial on the obstruction of justice charge, the United States called the defendant's attorney as a witness, arguing that the attorney's testimony was not barred by the attorney-client privilege because the crime-fraud exception applied. Reiterating the same test articulated in *In Re Antitrust Grand Jury* for applying the crime-fraud exception, the Sixth Circuit found that the government had made a prima facie showing of fraud and had

demonstrated a sufficient relationship between the document and the fraud, upheld the application of the crime-fraud exception, and allowed the attorney's testimony as evidence.

With these principles in mind, the court has reviewed the documents submitted *in camera*. In evaluating each document, the court initially determined if the document indeed came within the attorney-client privilege. If so, the court then applied the two-step process approved by the Sixth Circuit to determine whether the crime-fraud exception applied. First, the court examined whether Royal had made a prima facie showing of the specific fraud under the evidentiary standard adopted by the Sixth Circuit in *In Re Antitrust Grand Jury*. Second, the court determined whether a nexus existed between the document and the specific allegation of fraud which met the prima facie showing.

The following is a summary of the court's review.

### SPECIFIC DOCUMENTS

1. *S01257–66*—These pages consist of a cover memo and a seven-page draft of an agreement prepared by the law firm of Pepper Hamilton, SDG's outside counsel, and forwarded to Mark Merril, the Vice President and Treasurer of SDG on January 29, 1996. It appears that a copy of the cover memo and draft agreement was sent to Daryll Martin, Sedgwick's in-house counsel, to be presented to Home Insurance Company, SDG's primary carrier from October 23, 1993, to February 17, 1995, and to Northfield, the first layer excess carrier from October 23, 1993, to October 23, 1994. The draft proposes a resolution of certain outstanding coverage issues raised by Northfield including, *inter alia*, the allocation of general litigation expenses among the various insurance policies. This document was clearly developed for the purpose of providing legal advice to SDG. It is therefore covered by the attorney-client privilege.

■ The court has considered whether the distribution of copies of the document to

Pera and Martin constituted a waiver of the privilege. As noted in the previous orders, both Pera and Martin are "insiders" for the purpose of SDG's dealings with Royal. The subject matter of the instant memo and proposed agreement are coextensive with the issues SDG faced with Royal, and it would be important for Sedgwick and its employees to know the proposed resolution of the Northfield and Home issues, because that resolution would impact the dispute with Royal.[2] No crime-fraud exception to the attorney-client privilege applies to this document set, as the documents were prepared in late January 1996, well after SDG's insurance policy with Royal was bound and effective. Additionally, there is no indication that this document relates in any way to legal advice in furtherance of Royal's five allegations of fraud; rather, the legal advice relates to issues with Home and Northfield. Therefore, documents S01257–66 are not discoverable.

2. *S01338–67*—These documents are a subset of Pera's handwritten notes contained in a notebook bearing the title of "Sofamor Danek, 9/95–4/96." The court has reviewed every single page of this set to determine whether each individual page is discoverable.

S01338 is the title page for the notebook, and no issue of privilege or other objection may properly be raised to its discovery. It is therefore discoverable.

■ S01339–S01345 are notes of conversations that Pera had with a variety of people from September 7, 1995, to October 12, 1995, while he was attempting to place insurance coverage for SDG with a number of different companies. All of the notes relate directly to the ordinary business of procuring insurance coverage. Importantly, nowhere in these pages are there any notes of conversations with any attorneys. Therefore, the attorney-client privilege is inapplicable. Sedgwick, of course, argues that the information contained in the notes is "so intermingled [with Pera's communications with attorneys] as to make it impractical to separate them." (Non–Party Sedgwick James of Tenn., Inc.'s Notice of

---

**2.** There is no indication that this draft was actually sent to Home or Northfield, and there is thus no issue of waiver with respect to such a distribution.

Prod. Docs. for In Camera Inspection at 6–7.) This argument is simply erroneous. First, Sedgwick fails to point to any authority for the proposition that notes of regular business dealings without the involvement of an attorney may nevertheless become shielded by attorney-client privilege. Sedgwick seems to urge that once a client contacts an attorney about a matter, anything the client says to anyone thereafter is privileged. Such an expansive reading of the attorney-client privilege would do violence to Tennessee's interpretation of the privilege, and would prevent courts from receiving evidence of anything a person did or said to anyone after he consulted a lawyer. This court is not willing to adopt such a reading. Additionally, despite Sedgwick's concerns, it is possible to separate those notes that directly relate to the attorney-client relationship from those that do not by engaging in a page-by-page analysis. Because these pages involve ordinary business dealings and the attorney-client privilege does not apply to them, the documents are discoverable.

■ S01346 and S01347 contain notes of a meeting on October 27, 1995 involving Pera, Mark Merrill, Randy Tuskowski, an attorney at Sedgwick, Richard Duerr, and Charles Kahsen, the senior vice-president of Sedgwick. Although Pera describes the purpose of this meeting as being "to discuss strategy and to obtain legal advice on how Sofamor Danek should proceed in dealing with current and future carriers . . . and how Kahsen's department could assist with this effort," (Pera Second Aff. at 3), the topic of the meeting appears to have been the manner in which Sedgwick and SDG could enter into a particular business arrangement. The notes of the conversation reveal no strategy or legal advice from an attorney but rather indicate ordinary business dealings between two companies. Therefore, although some of the participants happened to be attorneys, they were functioning in this meeting as businessmen—not as attorneys giving legal advice to clients—and there is no attorney-client privilege for these documents. The documents are discoverable.

■ S01348–S01353 contain notes of a meeting on October 28, 1995, involving Pera, attorneys from two insurance companies, SDG's outside counsel, and one of Sedgwick's attorneys. The meeting involved decisions regarding the method of billing for legal work and an update on the status of litigation. The notes clearly indicate that attorneys from two other insurance companies were present and that the discussions involved general decisions about billing methods and other matters pertinent to insurance issues. The presence of the other insurance companies waived any attorney-client privilege of SDG and the documents are discoverable.

S01354 consists of notes dated November 15 of Pera's conversations with Debbie Cohen, outside counsel for SDG, as well as notes of his conversations with representatives of other insurance companies regarding the possibility of providing insurance coverage for SDG. The attorney-client privilege prevents disclosure of lines 2–8 of this document, the notes of Pera's conversation with Cohen. As discussed earlier, Pera was an "insider" at this point, and the conversation was for the purpose of providing him with advice concerning the effects of particular litigation on SDG. The rest of S01354 is discoverable. The remainder of the notes do not indicate the involvement of an attorney in any of the other conversations, and the attorney-client privilege is thus inapplicable.

■ S01355 consists of notes of a conversation between Pera and Debbie Cohen on November 15, 1995, in which Pera received legal advice regarding the wording of policy exclusions. The attorney-client privilege applies to this document, and the crime-fraud exception to the privilege does not apply. The conversation concerned policy exclusion language in another insurance policy and had nothing to do with Royal. There is no indication that the conversation was in furtherance of or even related to any of the allegations of fraud made by Royal. Since the document is privileged and is not subject to an exception, it is not discoverable.

■ S01356 is Pera's notes of a conversation he had with Cohen, SDG's outside counsel, on November 16, 1995, during which Cohen provided Pera with legal advice about

the wording of specific policy exclusions in policies with insurers other than Royal. The notes are privileged, and the crime-fraud exception is inapplicable because the notes do not relate to Sedgwick or SDG's dealings with Royal and there is no indication of any relationship between the conversation and the allegations of fraud made by Royal. Since the document is privileged and is not subject to an exception, it is not discoverable.

Document S01357 is Pera's notes about actions he took on or about November 16, 1995, in his attempt to secure insurance coverage for SDG. Nothing in the document indicates the involvement of an attorney at any point, and the document is thus not privileged and is discoverable.

Documents S01358–S01360 consist of three pages of notes taken by Pera on November 20, 1995, relating to various issues of insurance coverage for SDG, including definitions of terms, information pertaining to payments by SDG to insurers, and what appears to be a list of things that Pera needed to do in order to effectuate coverage for SDG. There is no attorney-client privilege with respect to these documents because there was no attorney involved, and the documents are therefore discoverable.[3]

■ S01361–S01364 appear to be four pages of notes from a discussion between Pera and SDG's outside counsel on November 20, 1995 concerning the purchase of extended discovery and a designated claims exclusion. These documents fall within the attorney-client privilege as they reflect conversations between Pera and SDG's attorneys for the purpose of obtaining legal advice. Additionally, the crime-fraud exception to the privilege does not apply to this document set. Nothing in the documents relates to any of Royal's allegations of fraud, and although there is a mention of a "designated claims exclusion," that discussion is in no way connected to Royal. Even if this document satisfied the prima facie showing of fraud

required to invoke the exception, it would certainly fail the second prong of the crime-fraud test as there is simply no nexus between the document and any fraud. Thus, these documents are not discoverable.[4]

S01365–S01366 are notes Pera made on November 20, 1995, about discussions he had regarding the wording of another insurance policy. The documents are not privileged because no attorney was involved in the conversation and the documents simply reveal normal business negotiations by Pera to place insurance for SDG with another carrier. As a result, these documents are discoverable.

S01367 is Pera's handwritten chart comparing the coverage being offered by one carrier with that being offered by Royal and other carriers. There is no attorney-client privilege with respect to this document because it does not concern information being shared between an attorney and a client. As with so many other disputed documents in this case, there is simply no attorney involvement, and this document is therefore discoverable.

3. *S01368–73*—This undated document set contains various handwritten notes concerning Pera's comparisons of various insurance policies and lists of things to do to effectuate coverage. The top half of S01368 is a list of "items needed" to obtain coverage from Royal, including a list of information Royal had requested. The bottom half of S01368 is a description of information necessary to obtain coverage with another insurer. S01368 reveals no attorney involvement and it is therefore non-privileged and discoverable.

S01369 is a list of things Pera needed to do "tomorrow" and notes of interactions with Mae Bell and Jay Pearson. Neither are attorneys, and there is no indication that anything in this page memorializes attorney advice. Thus, this page is non-privileged and discoverable.

---

**3.** Additionally, there is no work-product protection for these documents since neither Sedgwick nor SDG could reasonably have anticipated litigation with these particular carriers.

**4.** S01364 appears to be part of this document set. Its contents are, at best, irrelevant to the

present litigation. However, Sedgwick and SDG have not argued relevance with respect to this particular document, and the court's holding that the document is privileged makes any analysis of relevance moot.

S01370 is a bare-bones outline of the items to be included in an insurance policy with Med Marc. There is no attorney involved, and the page is therefore non-privileged and discoverable.

S01371 is a chart of "advantages and disadvantages" prepared by Pera, comparing insurance coverage under Med Marc with that of Royal and another insurance company. This chart does not relate to legal advice or indicate attorney involvement, and it is thus non-privileged and discoverable.

S01372 is a list of concerns Pera had about coverage with Royal. There is no attorney involvement, the attorney-client privilege does not apply, and the page is discoverable.

S01373 is a chart of SDG's old insurance coverage and costs compared with its new coverage and costs plus a list of concerns dated November 21, 1995. No portion of this page indicates attorney involvement or legal advice. The page is therefore non-privileged and discoverable.

4. *S01374*—This document contains Pera's handwritten list of things to do, dated November 22, a description of a conversation he had with a representative of Royal on December 6, and a statement that he had conveyed this information to SDG. Nowhere in this document is any description of conversations with attorneys or the advice they might or might not have provided. Because there was no attorney involved, there is no attorney-client privilege, and the document is discoverable.

5. *S01393–1412*—These documents contain Pera's handwritten notes concerning the placement of insurance coverage for SDG.[5] S01393 and S01394 are the front and back of a "While You Were Out" telephone message to Doug Pera from Theresa Huber dated July 28, 1995, at 4:00. Huber was an employee of Risk Enterprise Management ("REM"), a subsidiary of Zurich Insurance. This note appears to refer to a previous

conversation regarding the definition of "occurrence date" in an insurance policy provided to SDG by Home. It is part of the routine business of Pera, that of procuring insurance coverage for his clients. This document is not privileged because there was no attorney present or involved in any way in the communication. It is therefore discoverable.

S01395 and S01396 appear to be notes of a conversation between Pera and Mae Bell, an employee at Repath, dated August 16 and August 11, 1995, respectively. Pera and Bell discussed issues concerning placement of coverage. Again, this type of conversation is part of Pera's routine business, not an attempt to secure legal advice. There is no privilege because there was no attorney involvement, and this document is discoverable.

S01397 contains handwritten notes of a discussion on August 11, 1995, between Pera and Richard Duerr, SDG's vice-president and general counsel, regarding insurance coverage for 1995 and 1996, and the coverage position of Home Insurance Company. The purpose of this communication was business, not legal. The mere fact that Duerr is an attorney does not automatically shield all communications that Pera may have had with him. In this conversation, Duerr was functioning as a businessman and a client of Pera, not as an attorney, and because the purpose of this communication was not legal advice, it is not privileged and is discoverable.

■ S01398 describes a conversation between Pera and Ron Hustion and a separate conversation dated August 7 between Pera and Jay Pearson at SDG. Both conversations pertain to issues of placing insurance coverage for SDG. This is Pera's ordinary business activity. No attorney was involved in either discussion and the attorney-client privilege does not apply to this document. In its Notice of Production, Sedgwick makes a one-sentence argument that this document contains work-product from prior litigation.[6] If

---

5. Although document S01412 at first appears to be a cover for the notes entitled "Sofamor 4/1/96–7/4/96," it cannot be because all of the dates on documents in the set are 1995. Thus, S01412 appears to pertain to another document set. It is discoverable (and probably irrelevant)

because it contains no communications between attorney and client.

6. In support of this argument Sedgwick cites to the court's March Order at page 57, a page that does not exist. Thinking Sedgwick may have

Sedgwick is referring to litigation with other carriers, there is· no proof in this case of the date when SDG would reasonably have anticipated litigation with other carriers. In fact, the only indication this court has of any date of anticipated litigation is from a related case, *Steadfast Ins. Co. v. Sofamor Danek Group, Inc.*, No. 97–CV–2863 (W.D.Tenn.), in which the court adopted September 1995 as the first date that SDG could reasonably have anticipated litigation. S01398 predates even that date. Since there is no attorney-client privilege, and there is no work-product protection, this document is discoverable.

S01399 consists of Pera's notes of a conversation he had on August 7, 1995, with Mark Merrill of SDG and Mark Forrester of Sedgwick concerning the price of insurance coverage, issues of extended discovery wording, and the definitions of occurrence dates in various policies. No attorney was even present at the meeting, and the privilege does not apply. Thus, this document is discoverable.

■ S01400 contains both discoverable and non-discoverable information. Lines 1– 15 and 32–40 contain Pera's notes from phone calls made in his attempt to place coverage for SDG. No attorney was present, and these portions are therefore non-privileged and discoverable. Lines 16–31, on the other hand, are handwritten notes about a conversation between Pera and SDG's outside counsel on August 7, 1995, concerning the impact of certain policy definitions on pending litigation. This discussion was between an attorney and a client for the purposes of legal advice, was intended to be confidential, and is protected under the attorney-client privilege. The crime-fraud exception does not apply to this portion of the document because there is no relationship whatsoever between the information in the document and Royal's allegations of fraud. Therefore, this portion of the document is not discoverable.

S01401 consists of Pera's handwritten notes dated June 22, 1995, of conversations he had with Theresa Huber and Jay Pearson regarding the definition of "occurrence date"

under a policy other than the one written by Royal. This was ordinary business and there was no attorney involved, thus this document is non-privileged and discoverable.

■ S01402–1403 are two pages of notes of a conversation between Pera and Richard Duerr on June 22, 1995. With respect to the last seven lines of notes on S01402 and all of S01403, the conversation concerned the status of an ongoing dispute with another insurance company and contained the legal analysis of Duerr, an attorney. Thus, this portion is privileged. Because nothing in this section pertains to Royal's allegations of fraud, the crime-fraud exception does not apply, and this section is not discoverable and may be redacted.

■ With respect to everything above the last seven lines on S01402, Duerr was functioning as the vice-president of SDG, not as a lawyer. This section contains notes of issues pertaining to the placement of coverage, which is the ordinary business of Duerr and Pera and is not privileged. However, even if this section were privileged, it would be discoverable under the crime-fraud exception. Royal has made a prima facie showing based on the affidavit of Jim Dixon of fraudulent omission of the number of new claims received during October/November 1995, and of fraudulent misrepresentation of the level of current and future legal expenses. This document bears a close relationship to Royal's allegation that SDG misrepresented the level of current and future legal expenses, as well as the magnitude of new claims, and the document appears to be in furtherance of both objectives. Therefore, because this portion of the document is not privileged, and would be subject to the crime-fraud exception even if it were privileged, it is discoverable.

S01404 and S01405 are two undated pages of notes concerning placement of insurance coverage for SDG. There is no indication of any attorney involvement, and the attorney-client privilege is therefore inapplicable. These documents are discoverable.

cited to the wrong order, the court also reviewed page 57 of its July Order, but that page lends no

support to Sedgwick's argument either.

S01406 is a note dated July 18 concerning a telephone call Pera made. There is no indication of any attorney involvement, and the attorney-client privilege is therefore inapplicable. This document is discoverable.

The first portion of S01407 contains notes of a meeting Pera had on August 22, 1995, at 2:00 with Richard Duerr, Mark Merrill, Jay Pearson, Lawrence Fairey (Sedgwick's Chief Financial Officer), and Jim Gollogy (Sedgwick's President) concerning the placement of insurance coverage for SDG. The discussion was one of normal and ordinary business, not one of legal analysis or advice. Duerr was apparently the only attorney present but was acting as a businessman, not as an attorney. This portion of S01407 is not privileged and is discoverable.

The remainder of S01407 and S01408 consist of handwritten notes Pera made about a discussion with Mark Merrill concerning wording of an insurance policy. Sedgwick has not claimed attorney-client privilege with respect to this information, presumably because neither Pera nor Merrill were attorneys. Sedgwick has, however, claimed work-product protection for this portion, but the work-product doctrine is inapplicable because the documents were prepared prior to Royal's Reservation of Rights letter, which the court has previously determined to be the starting point for work-product. (July Order at 36–37.) These documents are therefore discoverable.

S01409–1410 are Pera's handwritten notes of a meeting held on August 24, 1995. Although the notes do not indicate the names of those attending, it appears that representatives of a number of insurance companies were present. There is no indication that any attorneys even attended the meeting, and the content of the documents does not contain any legal advice whatsoever. Therefore, the attorney-client privilege does not apply to these documents and they are discoverable.[7]

S01411 details a conversation Pera had with Theresa Huber on August 24, 1995. No attorney was involved and the attorney-client privilege does not attach. The document is discoverable.

S01412 is a notebook cover entitled "Sofamor 4/1/96–7/4/96." It is not privileged and is discoverable.

6. *S01426–1430*—This is a five-page set of handwritten notes of a conversation Pera had with Debbie Cohen, SDG's outside counsel, and Mark Merrill. Although the documents are undated, they appear to have been made after April 5, 1996. The documents are privileged. The only people present were counsel, Merrill, who is an SDG employee, and Pera, who is an insider at this point. The conversation was for the specific purpose of providing legal advice concerning the wording of various insurance policies held by SDG. Additionally, those present discussed ongoing litigation and strategies for resolving that litigation. The crime-fraud exception does not apply to these documents, as there is no nexus between the substance of the conversation and Royal's allegations of fraud. Thus, this document set is not discoverable.

7. *S01460*—This document contains notes dated July 16, 1996, regarding a conversation between Pera and SDG's outside counsel about obtaining contribution from Stuart Medical's insurance carriers. The conversation was between Pera and SDG's attorney for the purpose of obtaining legal advice, and the document is privileged. The crime-fraud exception does not apply to this document because it does not contain information pertaining to or in furtherance of any of Royal's allegation of fraud, and because it is dated nearly nine months after the period of time during which Royal alleges the fraud occurred. Thus, this document is not discoverable.

8 and 9. *S01467 and S01468*—The non-redacted portions of these pages that

7. The court notes that the documents may be protected by the work-product doctrine with respect to the numerous underlying product liability claims filed against SDG, although they are not protected by work-product with respect to the insurers here because the information was conveyed to the insurers who were present. Because of the sensitive nature of the information with respect to SDG's potential liability in the products suits, the court orders disclosure of these documents subject to a confidentiality agreement.

were produced to the court contain handwritten notes of a discussion between Pera and Debbie Cohen, SDG's outside counsel, concerning the appropriate strategy to pursue in seeking payments from SDG's insurance policies and contribution from Stuart Medical. For the same reasons that apply to S01460, these documents are privileged, not within the crime-fraud exception, and therefore not discoverable.

■ 10 and 12. *S07581–7584 and S07698–7700* [8]—This is a memo from one of SDG's outside counsel, James Beck, to Richard Duerr prepared October 2, 1995, regarding the impact of a recent decision, *English v. Mentor Corp.* on bone screw litigation. This memo is protected under the attorney-client privilege as it was developed for the purpose of conveying legal advice to Duerr about the effect of *English* on other ongoing litigation. The crime-fraud exception does not apply because there is no relationship between the memo and any of the frauds alleged by Royal. Additionally, as the court noted in both of its previous orders, this document is protected by the work-product doctrine. For all of these reasons, this document is not discoverable.

■ 11. *S07593–7603*—This is a fax cover sheet dated November 9, 1995, and a letter dated November 6, 1995, from Sedgwick's senior vice-president Charles Kahsen to SDG's vice-president, Richard Duerr.[9] The letter first describes a meeting in Philadelphia on October 26–27, 1995, and recites much of the information shared during that meeting. The bulk of the letter is devoted to a "claims consulting proposal" and delineates the costs and benefits of hiring SDG as an auditor. Although the document bears the warning "PRIVILEGED AND CONFIDENTIAL PREPARED IN ANTICIPATION OF AND IN CONNECTION WITH SETTLEMENT DISCUSSIONS," such a stamp is by no means dispositive of whether the attorney-client privilege applies to the document. In fact, this document has nothing to do with legal advice. It is, quite simply, a business proposal between two companies that is identical in form and similar in substance to other proposals made between businesses on a daily basis. No attorney-client privilege applies to this document, and it is discoverable.

■ Even if the privilege did attach, however, this document would be discoverable under the crime-fraud exception. By the affidavit of Jim Dixon, Royal has met its prima facie burden by showing probable cause that a fraud occurred, and this document relates specifically to Royal's first three allegations of fraud—SDG's alleged failure to advise Royal that it would allocate MDL general litigation expenses to Royal, SDG's alleged failure to report the magnitude of new claims received during the application period, and SDG's alleged misrepresentation of the level of current and future legal expenses. Because this document is not privileged and would be subject to the crime-fraud exception if it were privileged, it is discoverable.

### CONCLUSION

■ For the reasons stated herein, Sedgwick is directed to produce to Royal for inspection within ten days of the date of this order, the documents designated as discoverable. Because no documents are being produced solely under the crime-fraud exception to the attorney-client privilege, there is no reason to consider Sedgwick's request "to be heard" prior to production.[10]

IT IS SO ORDERED.

---

**8.** Documents S07581–7584 and S07698–7700 are duplicate pages with the exception of a fax cover sheet attached to the first set. The same analysis applies to both sets.

**9.** Document S07603 does not appear to be part of this document set, although it was produced with this set. S07603 is Pera's handwritten description of conversations and of the benefits of a

business venture between Sedgwick and SDG. This page is not privileged because no attorney was involved in any of Pera's conversations, and the page is therefore discoverable.

**10.** SDG and Sedgwick argue that they are entitled to present arguments and information, *in camera* if necessary, before the court issues a ruling on whether the crime-fraud exception ap-

plies to any particular document. In support of this proposition, they rely on *Haines v. Liggett,* 975 F.2d 81 (3d Cir.1992), which indicated that a "more formal procedure" is required when a court determines whether the crime-fraud exception applies than when the court decides whether to grant an *in camera* inspection of documents. *Id.* at 96–97. The court in *Haines* noted that:

> The importance of the [attorney-client] privilege ... as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege ... with the assistance of counsel on both sides of the dispute.

*Id.* at 97.

In the present case, additional arguments would serve no purpose. SDG and Sedgwick have thoroughly argued their position that the crime-fraud exception does not apply to the documents produced for *in camera* inspection. Additionally, with all due respect to the Third Circuit, this court does not believe it would be possible to hold a hearing on whether the crime-fraud exception applies to particular documents without the risk of disclosure of possibly privileged information. Similarly, it would be unfair to permit SDG and Sedgwick to file arguments either *in camera* or under seal, because of the prejudice to Royal in being unable to participate. The very notion of an adversarial system of justice is predicated on representation of both sides in a case, not on one party urging its particular views while unburdened by opposition. Other than the reference to *Haines*, SDG and Sedgwick fail to point to any authority for the proposition that they are entitled to a hearing, and the court's own exhaustive research has not uncovered any additional support for Sedgwick's position.